283 So.2d 675

**Johnny Lee WYATT**

**v.**

**STATE.**

**4 Div. 225.**

Court of Criminal Appeals of Alabama.

Sept. 25, 1973.

Paul J. Miller, Jr., Phenix City, for appellant.

William J. Baxley, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Johnny Lee Wyatt was convicted of murder in the first degree and his punishment fixed at life imprisonment in the penitentiary. He was represented in the trial court by appointed counsel and is now in this court with a free transcript. He is represented on appeal by another lawyer appointed by the court.

The body of the deceased, Pleas James, was found by a next door neighbor on the morning of February 8, 1972, lying on his back near his chicken yard in rural Russell County, Alabama. In the late afternoon of February 7, 1972, this neighbor talked to the deceased on the telephone and later heard him sawing wood. She did not hear any disturbance at or around his house during the night. The next morning she received a telephone call from the daughter of the deceased making inquiry as to whether the neighbor had seen or heard her father the night before relating that she had called her father late the night before and having received no answer she was worried and apprehensive that something was wrong. Her father was seventy-five years of age and had a heart condition.

This neighbor used the telephone in the home of the deceased to call the Sheriff's Department to report his death and remained at the scene for the arrival of the Chief Deputy Sheriff of Russell County. She identified the deceased to the Chief Deputy and returned home.

The Chief Deputy took charge of the body and notified the coroner who came and examined the body. The coroner determined that the deceased had been shot twice, once in the right arm and once in the left side of his back. He had the body removed to a local funeral home. The Chief Deputy took numerous photographs of the locus in quo.

The State Toxicologist was summoned to perform an autopsy to determine the cause of death. After his qualifications were proven, the toxicologist testified that death resulted from hemorrhage and shock associated with multiple gunshot wounds to the body which penetrated the heart and damaged both lungs. The autopsy surgeon opened the chest cavity and upon explora-

tion found and removed two bullets from the right lung of the deceased.

There was one eyewitness to this killing and at the time appellant was on trial, he was a convict in the penitentiary serving a twenty year sentence for the same crime. This convict, Arthur Raymond King, alias "Rainbow", a witness called by the State, testified that he and appellant went to the home of the deceased in the late afternoon of February 7, 1972, for the purpose of burglarizing the home of decedent. "Rainbow" was armed with a 410 gauge shotgun and appellant, alias "Bull", was armed with a rifle. They hid in the bushes behind the hog pen and when the deceased came near them he was shot from ambush. "Rainbow" said the 410 gauge shotgun jammed and wouldn't fire and that appellant shot the deceased twice with the rifle. We are thus confronted with the eyewitness testimony of an accomplice to murder and appellant's conviction cannot stand unless there is, in this record, corroborating testimony in the required degree to that given by this convict. This compels a recitation of all the testimony in some detail.

Arthur Raymond King, alias "Rainbow" King, testified that he had known the appellant, Johnny Lee Wyatt, alias "Bull" Wyatt, for about six years. They lived in the Fort Mitchell community of Russell County; that he and Wyatt got together around twelve o'clock noon on the day of the killing and they stayed together until late that night; that he knew Pleas James before his death and that he and Wyatt went to James' home on that day arriving in the late afternoon. They hid in the bushes by the hog pen and that while waiting they heard James chopping wood and singing. After he got through chopping wood, they saw him coming toward the hog pens, stopped and was looking around. From the record:

"A. And he looked over there, and he stood up there for awhile after he looked over there. Then that's the time Johnny Wyatt jumped up and shot. And the

man, Pleas James, he broke and run; after the first shot was fired he broke and run. So that's the time I jumped up and Johnny Wyatt told me to shoot. So I didn't shoot. So he shot again. And the man's dog started barking. He was calling a name, and after we heard him calling the name a couple of times he don't call no more. So we went up and we left, see."

King further testified that he did not shoot but that Wyatt shot twice. After the shooting they waited around to see if he was dead but they never went to James' home. About an hour later they left and went to the road and set up a roadblock. After setting up the roadblock, they carried the guns a distance of three or four miles and hid them in some thick grass and underbrush on the right-away of some railroad tracks. He stated that he and Wyatt hitchhiked four rides from Phenix City to a point within four miles from James' home. They walked the railroad tracks to the place where they had previously hid the shotgun and rifle. The rifle belonged to a Mr. Bradley and the shotgun belonged to a man by the name of Miller. After getting the rifle and shotgun, they walked a dirt road to James' house and finally got on a path near the hog pen and were in the bushes about ten minutes before the shooting started.

King further testified that Wyatt had a ski mask with him. It was "like a tam you pull over your face—got an opening for your eyes and nose and mouth"; that while King was in jail another prisoner, Willie Lee Denson, who was an assistant jail cook and who had the run of the jail, brought him a sack that had some shorts and a handwritten note in it; that he sent for his father and gave him the note and that his father gave the note to the officer who in turn gave it to the Assistant District Attorney, Bob Faulk.

According to King, the first ride that he and Wyatt caught was at Putnam's Texaco

Service Station on Broad Street in Phenix City. The car was driven by George Jackson and he carried them below Uncle Bud's store in the direction of James' house. They walked a short distance and caught another ride with John Henry Hartley who carried them to Mount Olive High School. At the school, they were picked up by Eddie B. Hoskins who carried them to a point near the Fort Benning Road. At this place they were picked up by a service man who was coming down the Fort Benning Road off the reservation. This ride carried them across the Uchee Bridge. King and Wyatt then walked on the property of Mr. Forbes Bradley to the place they had previously hidden the guns.

George Jackson testified that on February 7, 1972, he went to Columbus, Georgia to get some cloth and was on his way back to 165. He picked up two men whom he knew to be "Rainbow" and "Bull" and he carried them to a place below Uncle Bud's Grocery Store and they both got out of the car where he turned on another road leading towards his home.

John Henry Hartley testified that he picked up two hitchhikers on the afternoon of February 7, 1972, near Uncle Bud's store and let them out of his car at the Mount Olive High School. It was around four-forty-five p.m. when he left them. He made an in-court identification of Wyatt as one of the hitchhikers.

Eddie B. Hoskins testified that he lived on the Fort Mitchell Road and that on the afternoon of February 7, 1972, he picked up two hitchhikers and let them out of his car right below Mount Olive High School near the Fort Benning Road; that it was a few minutes before five o'clock when they got out of his car. He had known both men for some time but did not know their names. He was absolutely positive that Wyatt was one of the hitchhikers and that the other one was back in the witness room.

King was arrested first in connection with the murder of James. He signed a waiver and made a statement in which he implicated Wyatt. On the strength of that statement Wyatt was arrested without a warrant and while being booked at the county jail a routine search of his person was conducted and a ski mask was found on his belt. It was brown and red and had holes for the eyes, nose and mouth as had been described to the officers by King. It was properly admitted in evidence.

When King and Wyatt were arrested they were wearing crepe sole shoes. Plaster casts of footprints or shoe prints on the path by James' hog pen were made and turned over to the Toxicologist along with the crepe sole shoes. An examination and comparison was made by the Toxicologist who expressed the opinion that the casts were consistent with either or both pair of shoes.

King carried the officers to the place where the guns were hidden. After proper predicate, these guns were admitted in evidence without objection. The rifle was carried to the Toxicologist who test-fired it and made a microscopic comparison of the bullets which he removed from the body of Pleas James with the bullets which he test-fired and expressed the opinion that both bullets from the body of James were fired through the .22 caliber rifle identified as State's Exhibit 10.

Herman King, the father of Arthur Raymond King, testified that his son sent for him to come to the Russell County jail where he gave him a handwritten letter or note which was subsequently admitted in evidence as State's Exhibit 15. Herman King carried this exhibit and showed it to Chief Deputy Griffith after which he carried it home to show his wife. After his wife read the letter or note, he returned it to the Sheriff's office. He identified the exhibit in court and stated it was in the same condition as it was when his son gave it to him.

Willie Lee Denson, a witness for the State, testified that he was a trusty in the jail at the same time that King and Wyatt were prisoners awaiting trial; that he was assistant cook and it was his duty to serve food to the prisoners; that King and Wyatt were in separate cells. He stated that Wyatt asked him to deliver a package to Arthur Raymond King. Actually he told him to deliver this package to his rap partner Rainbow. He thought it was a pair of underwear shorts and he laid it on the table in King's cell.

Arthur Raymond King was recalled to the witness stand and identified State's Exhibit 15 as the item that was brought to his cell by Willie Lee Denson and the identical item that he turned over to his father; that the letter was in the same package with a pair of men's shorts.

In admitting Exhibit 15 in evidence the court said:

"THE COURT: All right. Let the record show that I did examine State's Exhibit 15 and another document at the same time. It would be the ruling of the Court that State's Exhibit 15 be admitted into evidence, with the exception noted by the defendant; that admission into evidence will be, however, under instructions from the Court that matters contained therein which are not connected with the offense with which you are concerned today shall in no way influence your verdict you reach in this case. I will admit it's a very ticklish sort of thing but the letter wouldn't make much sense unless you got all of it. But if other offenses—I will have to say that, now—might be mentioned you will not use that, however. This is just a letter admitted as a whole but only for your consideration to those matters which are before you today.

"MR. BENNETT: I would enter another objection.

"THE COURT: Let the exception be noted."

Exhibit 15 is as follows:

"A. 'Rainbow, look are here man. I had my case put of to next February but got the charge for murder and try to rob Forbes Bradley, so they got two charge on me, and they of me life for that murder and 20 year for that robbing case. Now I are take the 20 year for that rob case. If you help me get this murder case of my back my mamma came up here Sunday and she came up today. My aunt got me are lawyer. Did you see that lawyer what were with my mamma the morning. She got him for to get your time cut down to 10 year. She done that for to help you, man. She pay that lawyer five dollars for you, man, and my aunt pay me a lawyer a thousand dollar. Now, you help me get out that murder thing. I are still get 20 year for the rob thing because ain't no way I can beat that rob case. But my lawyer can win that murder if you tell the judge you ain't gone to testify against me. Now, on this robbing thing the D. A. want me to say you were with me when we try to rob Forbes Bradley. But we still friends. But I am gone to get 20 for that robbing and they want to you and me both for the robbing and give you some more time. But the only way they can do that by my word, but you know I ain't gone to let them do that to you, man. I am gone to cut you out the robbing thing but you got to cut me out that murder thing so I won't get life. Now, I will tell the man that it were another boy with me when I try to rob the man, but for you to get me cut out that murder thing you got to tell them the same thing I am gone to tell to get you cut out the rob thing. But for you to get me cut out the murder thing you gone to have to tell them you ain't gone to testify against me are tell them I didn't have anything to do with the murder and I are tell the same thing for you in the rob thing, because they want to try you on the rob case. But I ain't let them. They want me to up there in court and say you had some to do with

it, but you know I ain't gone to do to you. Man, I am gone to cut you out are it and put it on another boy and tell them the boy left town the same day. That what I am gone to do to cut you out the rob thing because I don't want to you with any more time and I want you to do the same thing for me. I want to be free. If I win the murder case I are get 20 year for the rob case. That old baldhead sheriff off me some money for to say you had some to with that robbing, but I wouldn't take it and I wouldn't tell them anything about it. He want get you some more time, man, but you know I ain't gone to let that happen to you, man. I suppose to be gone back to the hospital sometime in Montgomery. Write it on a piece of paper what you gone to say for to get me out that murder thing.' "

The State produced another witness who was in the Russell County jail at the same time that King and Wyatt were prisoners. He was Jerimiah Jones. He was brought to the trial below from a federal prison camp at Eglin Air Force Base in Florida. He testified that he was the jail cook and was in jail from February, 1972 to January, 1973; that he knew both Wyatt and King; that in October, 1972, Wyatt asked him to deliver a note to King. After he received the note he discussed the matter with Wyatt pointing out the danger of such note. Following this discussion Jerimiah did not deliver the note but tore it up. Over objections he was permitted to testify as to the contents of the destroyed note. It is as follows:

"A. Well, it started out about him apologizing to this Mr. King fellow about telling him or telling the sheriff that he had killed the man—or some man, I don't know the man; and that if he would withdraw that statement and tell them that another man killed him, who was driving a blue Dodge, that if he got cut loose, that when he got cut loose he would get a lawyer—get some money for a lawyer and get his time cut from five years, or down to five years, something of that nature; and that he was sorry that he had told Sheriff Murphy that he had killed a man—him speaking about King—he was sorry that he had told that King killed the man; and that if he wouldn't tell—if each would withdraw that and would not tell, that he, Johnny Wyatt, had killed the man, that he would in turn do this favor for him, get his time cut.

"Q. In other words, the essence was that he would see about getting a lawyer and trying to get King's time cut, if King didn't testify against him?

"A. That was it, sir.

"Q. That was the essence of the note?

"A. Yes, sir."

At the conclusion of the State's case, appellant made a motion to exclude on the ground that the State had failed to make out a prima facie case, and, further, that the only evidence presented by the State which supports the charge against the defendant is the uncorroborated testimony of an accomplice. This motion was overruled and denied.

Appellant took the stand and denied any involvement in the murder of Pleas James. He sought to set up an alibi. He did admit being with Rainbow King a part of the afternoon on February 7, 1972. He admitted riding with Hoskins, Jackson and Hartley but stated that when they were at Mount Olive High School someone in a blue and white 1960 Dodge automobile stopped and King got in this car and left and he did not see him any more. He stated that he left the school and walked home which was about ten miles, stayed ten minutes and went to the home of his girlfriend, Lillie Mae McCoy, and spent the night with her. Lillie Mae did not come to his rescue. He testified that he didn't

write any notes while in jail and did not talk to anyone while in jail; that all these people were lying on him. He never saw Exhibit 15 until it was shown him in court and he had never seen the shotgun and rifle before the trial.

In Slayton v. State, 234 Ala. 9, 173 So. 645, in dealing with the question of corroborative evidence of an accomplice, the court said:

"It should be kept in mind that corroborative evidence of an accomplice is of two kinds. One includes facts and circumstances ascertained in checking up on his version of the affair, matters tending to support the truth of his testimony, or vice versa. The competency of this class of circumstantial evidence does not turn on whether it tends to connect the defendant with the crime. The other class, one essential to conviction, is corroborative evidence which does tend to connect the defendant with the crime. This latter class must be proven beyond a reasonable doubt. As to the other, the jury may not believe the evidence of the accomplice beyond a reasonable doubt with respect to details, but still believe his evidence on the facts essential to a conviction beyond a reasonable doubt, and, if corroborated as the law requires, a conviction should follow."

Under the statute requiring corroboration of the testimony of accomplices to authorize conviction of a felony (Title 15, § 307, Code of Alabama 1940), the corroborative evidence need not be strong, nor sufficient of itself to support the conviction, the criterion being that it legitimately tends to connect the accused with the offense. 23 C.J.S. Criminal Law § 812(5), p. 125 (1961); Moore v. State, 30 Ala.App. 304, 5 So.2d 644.

Nor need such corroborative evidence directly confirm any particular fact stated by the accomplice. Skumro v. State, 234 Ala. 4, 170 So. 776.

Appellant admitted he had the ski mask on him when he was searched at the jail, but denied that it belonged to him. This item of evidence was certainly corroborative of the testimony of King and was just as potent as if the death weapon had been found in his possession. This item of evidence together with the testimony of Jackson, Hoskins and Hartley, and all the testimony concerning the note and letter written by appellant while in the Russell County jail made and presented a submissible issue for the jury's determination and the verdict of the jury should not be disturbed on this appeal.

The case is due to be and is hereby affirmed.

Affirmed.

All the Judges concur.