273 So.2d 242

Jimmy Frank **CAMERON**

v.

**STATE.**

**8 Div. 280.**

Court of Criminal Appeals of Alabama.

Dec. 19, 1972.

Rehearing Denied Jan. 23, 1973.

———◇———

William H. Rogers, Moulton, for appellant.

William J. Baxley, Atty. Gen., and Herbert H. Henry, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was tried and convicted for the offense of burglary in the second degree and his punishment fixed at eight years imprisonment in the penitentiary.

At arraignment the court ascertained that appellant desired an attorney to represent and defend him but was financially unable to employ counsel. The court thereupon appointed Hon. R. Earle Proctor and Hon. William H. Rogers, two outstanding and leading lawyers of the Moulton bar to represent him at trial. Mr. Rogers represents appellant on appeal.

On the night of December 9, or in the early morning hours of December 10, 1971, the store building of Windell Thrasher located near the intersection of Highways 33 and 157 in the city limits of Moulton, Lawrence County, Alabama, was broken into. According to the testimony of Mr. Thrasher he was notified around 3:00 A.M. on December 10, 1971, that his store had been burglarized. When he arrived at the store he was met by a police officer from the City of Moulton. He went in the store and discovered that a .38 caliber pistol, a

holster and a box of shells, together with about 75 cartons of cigarettes, currency and coins from the cash register, and some pennies in a quart fruit jar were all missing. Entrance into the store was gained by the removal of some wall paneling from inside a restroom separating the restroom from the main part of the store building. Mr. Thrasher testified that since the burglary, he had not seen any of the stolen goods that were taken from his store except the .38 caliber pistol in evidence.

From the record:

"Q. Did you find anything missing and, if so, what did you find missing?

"A. Cigarettes, some of them were gone; the cash register had been emptied and some pennies in some quart jugs were gone, and a .38 snub nose Police Special was gone with the scabbard.

"Q. A .38 caliber?

"A. Yes, sir.

"Q. A Police Special?

"A. Yes, sir.

"Q. Do you know what make?

"A. It was a Brazilian make, I think.

"Q. Anyway, a pistol. It was gone?

"A. Yes, sir.

"Q. Did you ever see that particular .38 caliber pistol again?

"A. Yes, sir.

"Q. Subsequent to that time?

"A. Yes, sir.

"Q. Did you—who had it when you saw it?

"A. The chief of police.

"Q. Chief Farris?

"A. Yes, sir.

"Q. And he had it?

"A. Yes, sir.

"Q. Did he keep it when you saw it in his possession?

"A. Yes, sir, he had it at the police department.

*    *    *    *    *    *

"Q. I will ask you to examine this pistol and tell the jury whether or not that pistol belongs to you and whether or not it was stolen from your store on the night of December the 9th or the early morning of December the 10th?

"A. I would say this was the gun.

"Q. Is that the pistol that was stolen?

"A. Yes, sir.

"Q. Was it loaded at the time it was taken?

"A. Yes, sir, and it was in a scabbard.

"Q. You haven't seen the scabbard?

"A. No, sir. And there was a box of shells.

"Q. Do you know how many bullets it had in it?

"A. There was a box of shells with it, too.

"Q. You haven't seen them since?

"A. No, sir.

"Q. The chief brought—and this pistol that you have just laid down is the pistol that was stolen from your store?

"A. Yes, sir.

"MR. PETTUS: We offer that in evidence as State's Exhibit 1.

*    *    *    *    *    *

"MR. ROGERS: I would like to ask this witness a few questions on voir dire, please, sir.

*    *    *    *    *    *

"VOIR DIRE EXAMINATION

"BY MR. ROGERS:

"Q. Mr. Thrasher, I noticed that you said that in your remembrance that you thought

this was the gun, and you said that it was; did you have any identifying marks on this pistol before it was taken from your store?

"A. No, sir.

"Q. Did you know the serial number of this pistol before it was taken from your store?

"A. No, sir.

"Q. I notice that the serial number has been removed or attempted to be removed from this weapon.

"A. It wasn't like that when it left the store.

"Q. It wasn't like that when it left the store?

"A. No, sir.

"Q. Then, Mr. Thrasher, if you didn't have any identifying marks on this pistol, and if you didn't have the serial number on this pistol, how can you say this is the pistol that was taken from your store? Do you know how many pistols of this particular model were made?

"A. No, sir, I don't. But did you ever have something and couldn't tell it when you seen it?

"Q. Yes, sir. I got a pocket full of change right now and I can't tell one penny from any other.

"MR. PETTUS: Maybe he hasn't examined them well.

"MR. ROGERS: Then if there is no identifying marks on this gun and he didn't know the number of it, Your Honor, then we object to this being introduced into evidence as being the gun that was stolen from his store.

"THE COURT: Mr. Thrasher, your testimony is that in your judgment that's the pistol that was taken from your store?

"THE WITNESS: Yes, sir.

"THE COURT: All right, overruled.

"MR. ROGERS: We take exception.

Whereupon the instrument hereinabove referred to was marked for identification as State's Exhibit No. 1, and received in evidence.

"STATE OF ALABAMA
LAWRENCE COUNTY

"I, Leon R. Eaves, Official Court Reporter for the Thirty-Sixth Judicial Circuit of Alabama, hereby certify that State's Exhibit No. 1 is a .38 caliber pistol and has written on the barrel on the right side '.38 Special'. Under the barrel on the right side is written 'I.N.A.' and under that is written 'Made in Brazil.' "

On cross-examination, Mr. Thrasher testified:

"Q. Mr. Thrasher, now you have told the Judge that in your opinion that was the gun that was taken from your store, in your judgment; now, what do you base your judgment on if you didn't have any identifying marks on it and you didn't have the serial number on it; what are you basing that statement on, in your judgment?

"A. Well, when I locked the store up, there was a gun just like that in the drawer in a holster.

"Q. You are saying there was a gun just like that in there?

"A. Yes, sir, except it had a serial number on it.

"Q. Except it had a serial number and this one doesn't have a serial number?

"A. Yes, sir.

"Q. Then your judgment is, you are basing your judgment on the fact that there was a gun similar to this one in your store when you left, and the similarity of this gun and that gun, you say is what you are basing your judgment on without any identifying marks; is that correct?

"A. All I know is that looks like the gun.'

"Q.  It looks like the gun?

"A.  Yes, sir.

 *  *  *  *  *  *

"Q.  But this is a serious case as all cases are, Mr. Thrasher, and of course you are under oath here; is there any mark on this gun that you can point to and definitely say, 'That was the gun that was in my store?'

"A.  No, sir.

 *  *  *  *  *  *

"MR. ROGERS: We renew our motion to exclude the introduction of this weapon into evidence and make a motion that it be excluded.

"THE COURT: All right.  Overruled. That's a question for the jury.

"MR. ROGERS: We take exception."

On re-direct, the following occurred:

"Q.  Let me ask you just one more question, please, sir: What was the difference in the size of the pistol that you had stolen and the size of this pistol here that I have in my hand and has been introduced into evidence as State's Exhibit 1?

"A.  Not any.

"Q.  What was the difference in the color and the plastic or whatever it is made of, the handle here?  What kind of handle did yours have?  Did yours have the same kind of handle?

"A.  Yes, sir.

"Q.  Was the handle identical with this with the same kind of markings?

"A.  Yes, sir.

"Q.  This has something like a tiger, I don't know what kind of animal it is; did the pistol you had have that same animal on it that's on this one right here?

"A.  Yes, sir.

"Q.  Identical?

"A.  Yes, sir.

"Q.  You said it was a Brazil gun, and this says 'I.N.A., made in Brazil,' did the pistol that was taken from your store have letters just like that on it?

"A.  Yes, sir.

"Q.  And made in Brazil on it?

"A.  Yes, sir.

"Q.  Just like that?

"A.  Yes, sir.

"Q.  Was it a black—what do you call this kind of gun?  Blue steel I always call it; did it look the same in appearance as that?

"A.  Yes, sir.

"Q.  Over here it has some kind of a Brazil thing, a Coat of Arms or something on it; did yours have that same thing on it, on the handle?

"A.  Yes, sir.

"Q.  And the other side of the handle have this?

"A.  Yes, sir.

"Q.  Just like that?

"A.  Yes, sir.

"Q.  I wish you would take that and make a minute examination of that pistol that you have in your hand and see if you can find anything in the world about that pistol that you hold in your hand that was different in any way from the pistol that you had stolen from your store other than the serial number?

"A.  No, sir, it looks just like the gun that was taken.

"Q.  In every respect?

"A.  Yes, sir.

"Q.  And everything that is on this pistol was on your pistol?

"A.  Yes, sir.

"Q.  I'm talking about these marks and so forth?

"A. Yes, sir.

"Q. All right."

Appellant and two other individuals, Jerry Charles Hagood and Lloyd Smith were indicted for this burglary. Hagood and Smith pleaded guilty and their application for probation was pending at the time of appellant's trial and were witnesses for the State. According to their testimony, they had been with appellant all day during December 9 and all day on December 10; that the three of them went to Thrasher's store and that while Hagood removed the paneling, appellant was present part of the time and acted as a "look-out" at other times; that after the paneling was removed, appellant and Smith entered the store and Hagood was on "watch" duty. When appellant and Smith returned with the fruits of the burglary, they put the two boxes of cigarettes down near the restroom and all three walked across the street to the car they had parked there before breaking into the store. Hagood and Smith got in the car and drove back to the store and got the cigarettes, drove back to the place where the car had been parked, picked up appellant and they went to appellant's sister's house in Colbert County and unloaded the stolen goods. They went to appellant's house in Colbert County and spent the night. They got up the next morning and went to Smith's house and got some food. They went to sleep at Smith's house and got up around five-thirty P. M. and drove to Town Creek to see appellant's and Smith's girl friends. They dropped Hagood at the skating rink and picked him up around 10:00 P.M. and drove out to Gillespie Ambulance Service on Highway 24. At Gillespie's, appellant gave a .38 caliber pistol to the station manager, Mr. Doyle Pinyan. Mr. Pinyan gave the same pistol to police officer Buford Pearson, who, in turn, gave it to the Moulton Chief of Police, Mr. James Farris. This pistol was marked State's Exhibit 1 and introduced in evidence.

This is a typical case of two admitted or self-confessed felons swearing against a defendant whom they claim was just as guilty as themselves of breaking and entering Windell Thrasher's store. Appellant's conviction cannot stand unless there is, in this record, corroborating testimony of that given by Hagood and Smith.

Both Hagood and Smith testified that they did not see appellant take the pistol while they were in Thrasher's store. Hagood testified that he saw the pistol in appellant's hand the night of the burglary when they left the stolen goods at appellant's sister's house in Colbert County. He also saw it early the next morning in appellant's possession and again the following night at Gillespie's Service Station when appellant was passing it back and forth to Billy Morris and at the time appellant gave it to Doyle Pinyan. Smith testified that he first saw the pistol in the daylight hours following the burglary and it was in appellant's possession. He was also at Gillespie's when appellant gave the pistol to Pinyan. Both testified that the pistol in evidence was the same pistol they had seen in appellant's possession following the burglary and was the same pistol appellant gave Pinyan the night after.

Billy Morris testified in behalf of appellant. He stated that he went with appellant to the skating rink the night after the alleged burglary and while there, Lloyd Smith showed appellant the .38 caliber pistol and appellant stuck it in his belt. He was present at Gillespie's later that night with appellant, Hagood and Smith but he could not remember anything that transpired because he was drunk.

Appellant testified in his own behalf. He denied that he had anything to do with the burglary of Windell Thrasher's store; that on the night of the alleged burglary, he spent the night alone in his mother's house near Russellville on the Colbert-Franklin County line. He first saw Lloyd Smith and Jerry Hagood at Langtown Skating Rink. Smith had a .38 caliber pistol, which he was showing Billy Morris. Morris took the pistol and showed it to him. He asked Smith

if he could keep the pistol awhile and Smith said, "okay", and he stuck it in his belt; that they went to J. B. Moody's and got some Whiteport wine and they all started drinking. Smith gave him some pills which he took and kept drinking wine. This caused him to lose his memory. He did remember going to Gillespie's the night of December 10, 1971. He still had the pistol with him and he "must have" given the pistol to the man at the station but he didn't remember. He did remember that when an officer came out to Gillespie's he "ran off." After he woke up, he returned to Gillespie's and was arrested and put in jail. He admitted that he was convicted in Lawrence County of burglary in 1967 and was placed on probation. His probation was revoked and he was sent to prison. He got out on parole and his parole was also revoked.

We have quoted copiously from the testimony of Mr. Thrasher as to the pistol identification because, putting aside the testimony of the accomplices, this is the only evidence that in any wise or manner tends to connect appellant with the crime for which he stands convicted. The identity of this pistol became a material fact, which, if the State's evidence be true, tended to connect appellant with the burglary.

In Slayton v. State, 234 Ala. 9, 173 So. 645, in dealing with the question of corroborative evidence of an accomplice, the Court said:

"It should be kept in mind that corroborative evidence of an accomplice is of two kinds. One includes facts and circumstances ascertained in checking up on his version of the affair, matters tending to support the truth of his testimony, or vice versa. The competency of this class of circumstantial evidence does not turn on whether it tends to connect the defendant with the crime. The other class, one essential to conviction, is corroborative evidence which does tend to connect the defendant with the crime. This latter class must be proven beyond a reasonable doubt. As to the other, the jury may not believe the evidence of the accomplice beyond a reasonable doubt with respect to details, but still believe his evidence on the facts essential to a conviction beyond a reasonable doubt, and, if corroborated as the law requires, a conviction should follow. * * *"

■ Under the statute requiring corroboration of the testimony of accomplices to authorize conviction of a felony (Title 15, Section 307, Code of Alabama 1940), the corroborative evidence need not be strong, nor sufficient of itself to support the conviction, the criterion being that it legitimately tends to connect the accused with the offense. 23 C.J.S. Criminal Law § 812 (5), page 125; Moore v. State, 30 Ala.App. 304, 5 So.2d 644.

■ Nor need such corroborative evidence directly confirm any particular fact stated by the accomplices. Skumro v. State, 234 Ala. 4, 170 So. 776.

■ Appellant admitted he had possession of the pistol the following night after the burglary and that he gave this pistol to the service station attendant, who, in turn, gave it to the police officers. This pistol was identified by Thrasher as being in his store at six p. m. (on the night of the burglary) when he locked the store and it was missing at three a. m. the next morning when he was notified of the burglary. It is true that Thrasher's identification was, in the main, in response to leading questions propounded by the District Attorney. However, there were no objections to the form of these questions. We hold the pistol identification made a submissible issue for the jury.

A case squarely in point on the issues here presented is Dailey v. State, 233 Ala. 384, 171 So. 729. There the court said:

"One of the circumstances tending to connect the defendant with the killing re-

lates to the pocketknife of the deceased. Mizelle said he took this knife from the pocket of deceased at the time of the murder and robbery, and handed it to this defendant. Other witnesses testify that some three months later, defendant had possession, and disposed of the knife to another. The knife was in court and was quite positively identified by the sister of decedent, mother of Mizelle, as the pocketknife of deceased which had been in the family many years. Defendant and his witnesses denied the identity of the knife, testified that the knife in court was obtained from another source prior to the homicide. The knife, with its identifying marks, as well as the witnesses being before the jury, it was for them to say whether it was the pocketknife of deceased. If they so found, it would follow that defendant's contention was false, and, thereupon, an inference that he could make no honest explanation of his possession of the knife other than that of Mizelle."

With a substitution of names, offenses, weapons, the time element, and a few details, the *Dailey* case, supra, is on "all fours" with the instant case.

Appellant filed a motion for a new trial raising, among other things, the sufficiency of the evidence, the denial of the motion to exclude the pistol from the evidence, denial of the motion to exclude the state's evidence, the failure of the State to adduce evidence in corroboration of the testimony of the accomplices, and certain exceptions to the court's oral charge. Upon the exceptions to the oral charge being brought to the attention of the court, he instructed the jury further and thereby cured any misstatements of the law in the original charge.

In the light of what we have said, there was no error in the ruling of the court in denying the motion for a new trial. Nor was there error in the refusal of requested written charge "D–1". This charge was al-

most identical with written charge "D–2" given at the request of appellant.

The case is due to be and is hereby affirmed.

Affirmed.

All the Judges concur.