291 So.2d 358

Fred GOODMAN

v.

STATE.

6 Div. 652.

Court of Criminal Appeals of Alabama.

March 5, 1974.

Ralph Bland and James F. Berry, Cullman, for appellant.

William J. Baxley, Atty. Gen., and Sarah M. Greenhaw, Asst. Atty. Gen., for the State, appellee.

HARRIS, Judge.

Appellant was convicted of murder in the first degree and sentenced to life imprisonment. He made known to the court that he was unable to employ counsel to defend him, and the court appointed two distinguished and outstanding members of the Cullman Bar to represent him. These two lawyers were present at the arraignment when appellant pleaded not guilty, and they also represent him on appeal.

At the time of his death Frank Luker was 51 years of age. He and his wife operated a combination grocery store and service station in the Jones Chapel Community of Cullman County. The Luker home was about one-hundred feet from the store. On the second day of January, 1973, Mrs. Luker left the store around five thirty p. m. and went to their home. Some thirty minutes later, Mr. Luker came to the house mortally wounded from a pistol shot wound and was bleeding profusely. He feel to his knees and said to his wife, "Oh, Lord, Iris, Oh, Lord, Iris. I am shot. I am dying." His wife asked him who did it and he said, "It was that Hartselle gang." He then fell on the floor and said, "You told me." He was dead on arrival at the hospital.

When Mrs. Luker left the store, she saw a green or blue car parked in the lot of a church near the store. She saw two men on the front seat and thought she saw a third person on the back seat. She had never seen the defendant before the trial. She knew a Harold Singleton, who was also indicted for the death of her husband. Singleton pleaded guilty. She also knew one Billy Patterson, who testified for the state and implicated both the defendant and Singleton. Patterson was not indicted.

Mrs. Luker further testified that in September, 1972, she and her husband were sitting on the porch of the store when a

car occupied by Singleton, Patterson and two others on the back seat drove up and parked about twenty-five feet from the store. Someone in the car called Mr. Luker over, and he talked to the occupants for a few minutes and the car was driven away. Some time later, this same car came back and a colored man got out and walked by the store. They watched him walk out of sight going toward Cullman.

In November and December, 1972, Singleton and Patterson were back at the store again. In December, they came in the store and stayed a few minutes. Around noon on the day of the homicide, Singleton came in the store alone and had a brief conversation with Mr. Luker. Mr. Luker left the store to pick up a plate lunch at a nearby cafe for Mrs. Luker, and Singleton went with him but did not come back with her husband.

In September, 1972, about four months before Mr. Luker was murdered, a conspiracy to rob him was formed in a pool hall in Hartselle, Alabama. Those participating in this conspiracy were appellant, Harold Singleton and Billy Patterson. Appellant and Singleton came to the pool hall to see if Patterson, a part-time employee there, was interested in helping them pull the robbery. According to Patterson, the plan was to drive up to the gas pump and when Mr. Luker came out to service the car, they would force him into the car and drive away. They were going to lock him in the trunk of the car and then abandon the car. The driver was to wear a wig and one of the others, wearing a mask, was to lie down on the back seat until Mr. Luker came to the car. They bought a wig and made a mask with eye holes from the sleeve of a sweater. They purchased a roll of tape to tie up the victim. Patterson was not familiar with the Luker place and wanted to look it over before deciding if he wanted to be involved.

Patterson was an ex-federal convict. He had served three terms in a federal penitentiary, one for burglary, one for violating the Federal Firearms Act—possession of a sawed-off shotgun, and a parole violation. While in prison, he became friendly with a negro convict named French Ford. Patterson wanted Ford in on the robbery. Ford was living in Atlanta, Georgia, and sometime in September, 1972, Patterson went to Atlanta and got Ford. Ford registered in a motel in Decatur, Alabama. Ford, too, wanted to see the Luker place before making up his mind about participating in the robbery. Patterson left Hartselle in his car with appellant and Singleton and drove to Decatur to pick up Ford. The four then drove to Mr. Luker's place and Ford got out and walked by the store. After the trip, Patterson told appellant and Singleton that he didn't want to have anything to do with the robbery, "because there wasn't any way you could get away from there." Ford said he didn't want to have anything to do with the robbery either. The four left Cullman County and went to a motel in Decatur where Patterson went to sleep. Sometime later, appellant waked him and said someone was at the door. Appellant opened the door and found Sergeant R. E. Hancock, a Criminal Investigator with the Alabama State Department of Public Safety, and two other law officers. They had a warrant for appellant's arrest. While making the arrest, the officers found a wig, a mask and a roll of tape. The officers confiscated these items, and they were introduced at appellant's trial, after being identified by Patterson.

After appellant was released from jail, he returned to the motel and tried to persuade Patterson to go with him and Singleton to rob Mr. Luker, but Patterson refused to go with them.

The night before the murder, Singleton drove his automobile to a local auto parts company. There was another man in the car with him. A short time later, Singleton's car was seen leaving this place and was followed by another automobile. The

owner of this business testified that he had two green Bel-Air Chevrolet automobiles on his lot at the time Singleton came to the lot. One of these automobiles was missing from this lot the next morning. After the murder, the officers found this automobile parked on a road eight-tenths of a mile from the Luker store. The motor was still running, but no one was around the car. It had been abandoned.

On the morning of January 3, 1973, Patterson learned that Mr. Luker had been killed the night before. Around one p. m. on that date, Singleton went to the pool hall in Hartselle and told Patterson that he and appellant wanted to go to Southgate, Michigan, but neither of them had a driver's license and asked Patterson to drive them. Patterson drove them to Southgate in Singleton's 1969 Nova Chevrolet. They went through West Virginia, Kentucky and Cincinnati, Ohio, on the way to Michigan. Appellant drove the automobile from Cincinnati to Southgate and Patterson rode in the back seat. During this trip, Singleton said he hoped no one saw them throw the gun in the waters of Flint Creek (in Cullman County), and appellant said he didn't think anyone saw them as there was an old house near the creek, and he didn't think anyone lived there.

When they arrived in Southgate, Singleton made contact with a used car dealer and traded his Nova Chevrolet for a 1968 Ford automobile and a cash difference of $225.00 He requested the dealer to put title to the Ford in Patterson's name. The dealer lived in Somerset, Kentucky, and the trio had to go to Somerset to get the title papers. They arrived in Somerset on Saturday and learned they could not get the title papers until the following Monday. They registered in a local motel. The Somerset police arrested all three men and charged them with possession of burglary tools.

Patterson was released from jail in Kentucky to the custody of the Sheriff of Cullman County, Alabama, and one of his deputies. He told the officers about the conversation he overheard between appellant and Singleton with reference to them throwing the pistol in the waters of Flint Creek in Cullman County. He went with the officers to Flint Creek the night he got back to Alabama, and a diver with the Rescue Squad of Cullman County retrieved the pistol. The pistol had mud and rust on it but was carried to the office of the Assistant State Toxicologist in Huntsville on January 13, 1973. Mr. Van Pruitt, Jr., Regional Laboratory Director, identified the pistol as a Smith and Wesson 357 magnum model 27–2 with a three and a half inch barrel, six shell capacity. Pruitt testified that when he received the pistol, there was present under the hammer one Winchester-Western Super 357 spent cartridge and five Winchester-Western Super 357 cartridges unfired.

A bullet was cut out of the tree near the place where Mr. Luker was shot and delivered to Mr. Pruitt at the same time the pistol was delivered, but this bullet was so battered and damaged that he could not say from a microscopic examination and comparison if it was fired from this particular pistol. However, this bullet was similar to the spent and unspent cartridges in the pistol.

Mr. Pruitt performed an autopsy on the body of Mr. Luker and gave his opinion as to the cause of death. He said death resulted from "a single gunshot wound sustained in the right back resulting in injury to the right lung with massive hemorrhage into the right pleural cavity." He further testified that he was shot in the back and the bullet exited in the right front chest.

A state witness testified that he had a conversation with Singleton in December, 1972, in which Singleton told him that he went deer hunting in Mississippi, and while returning to Alabama on the Natchez Trace, he shot a deer with a rifle. The deer fell but got up and ran away. Singleton said if he had had his 357 magnum, he

would have killed the deer. It was a 357 magnum that was recovered from the waters of Flint Creek, where Singleton and appellant said they had thrown the gun while on the trip from Cincinnati, Ohio, to Southgate, Michigan.

■■■ The law governing cases of this kind has been many times pronounced by this court and the Supreme Court of Alabama. In Stokley v. State, 254 Ala. 534, 49 So.2d 284, the Supreme Court said:

"It is well established that when, by prearrangement or on the spur of the moment, two or more persons enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty participant, and in the eye of the law is equally guilty with the one who does the act. Such community of purpose or conspiracy need not be proved by positive testimony. It rarely is so proved. The jury is to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case. Morris v. State, 146 Ala. 66, 41 So. 274, and cases cited; Jones v. State, 174 Ala. 53, 57 So. 31; Teague v. State, 245 Ala. 339, 16 So.2d 877.

"When two or more persons enter upon an unlawful purpose, with a common intent to aid and encourage each other in anything within their common design, they are each responsible, civilly and criminally, for everything which may consequently and subsequently result from such unlawful purpose, whether specifically contemplated or not. Jones v. State, supra; Jolly v. State, [94 Ala. 19, 10 So. 606] supra; Tanner v. State, 92 Ala. 1, 9 So. 613."

In Slayton v. State, 234 Ala. 9, 173 So. 645, in dealing with the question of corroborative evidence of an accomplice, the court said:

"It should be kept in mind that corroborative evidence of an accomplice is of two kinds. One includes facts and circumstances ascertained in checking up on his version of the affair, matters tending to support the truth of his testimony, or vice versa. The competency of this class of circumstantial evidence does not turn on whether it tends to connect the defendant with the crime. The other class, one essential to conviction, is corroborative evidence which does tend to connect the defendant with the crime. This latter class must be proven beyond a reasonable doubt. As to the other, the jury may not believe the evidence of the accomplice beyond a reasonable doubt with respect to details, but still believe his evidence on the facts essential to a conviction beyond a reasonable doubt, and, if corroborated as the law requires, a conviction should follow.   *   *   *"

■■■ Under the statute requiring corroboration of the testimony of accomplices to authorize conviction of a felony (Title 15, § 307, Code of Alabama 1940), the corroborative evidence need not be strong, nor sufficient of itself to support the conviction, the criterion being that it legitimately tends to connect the accused with the offense. Moore v. State, 30 Ala.App. 304, 5 So.2d 644.

Nor need such corroborative evidence directly confirm any particular fact stated by the accomplice. Skumro v. State, 234 Ala. 4, 170 So. 776; Cameron v. State, 49 Ala. App. 482, 273 So.2d 242, cert. den., 290 Ala. 363, 273 So.2d 248.

"Any circumstantial evidence is sufficient to corroborate if it proves that accused was connected with the criminal act, or tends to connect him with the commission thereof, or if such connection may reasonably or clearly be inferred from the corroborative evidence;

and where the accomplice is strongly corroborated by facts and circumstances connecting accused with the crime, a conviction will be sustained." 23 C.J.S. Criminal Law § 812(3), page 109.

■ There was a continuing conspiracy to perpetrate the crime of robbery from September, 1972, to January 2, 1973, when the deceased was killed in the attempted robbery. The scheme to rob involved the use of a wig, a mask and a roll of tape. At the time appellant was arrested in the motel in Decatur, the arresting officers found and took with them the wig, mask and tape. Although the testimony relating to these items may have intended to show a separate and distinct crime, these items were properly admitted in evidence to show knowledge, intent, plan, design, motive and identity. They tended to shed light on the identity and intent of the appellant in this cause. Baggett v. State, 45 Ala.App. 320, 229 So.2d 819; "The Law of Evidence in Alabama" by Judge J. Russell McElroy, Vol. 1, 2d Ed. pp. 166–169, 6 Ala. Digest, Criminal Law, ☜No. 365.

■■ There was no error in admitting the testimony concerning the statement made by Singleton with reference to the ownership of a 357 magnum pistol, though the statement was made out of the presence of appellant. Ample evidence was presented to show or imply that appellant and Singleton were co-conspirators. This statement was made by Singleton in December before the attempted robbery was committed on January 2, 1973, resulting in Mr. Luker's death. The conspiracy to rob was still in progress and had been continually in existence since the previous September. Where a conspiracy is shown to have existed between appellant and a third party, the declarations or conduct of the third party, not made or done in the presence of appellant, are admissible against appellant. Muller v. State, 44 Ala.App. 637, 218 So.2d 698; Bland v. State, 42 Ala.App. 392, 166 So.2d 728.

There was testimony connecting a 357 magnum pistol with the death of Mr. Luker, and there was testimony that appellant and Singleton had thrown a gun in the waters of Flint Creek after Mr. Luker was killed. There was also testimony that such a weapon was found in the creek where they said they threw it. The fact that one of the co-conspirators stated that he had such a gun was relevant and admissible as being part of the conspiracy. Gandy v. State, 29 Ala.App. 485, 198 So. 265; Lancaster v. State, 214 Ala. 2, 106 So. 617.

The wig, mask, roll of tape and the 357 magnum pistol, being properly identified, were admissible as a material link in the circumstances tending to connect the accused with the offense. Ala.Digest, Criminal Law, ☜No. 404(4).

The tendencies of the evidence indicate that Patterson abandoned the unholy alliance. Assuming, without the necessity to decide, the non-accessorial status of Patterson, there was ample evidence to connect appellant with the commission of the crime for which he stands convicted.

■ The "rule" was invoked before the trial got underway. The trial court permitted three Deputy Sheriffs, who were witnesses in the case, to remain in the courtroom for security purposes. Appellant objected to these officers being excused from the rule, the court overruled the objection, and appellant claims error to reverse was then committed. We do not agree. Exclusion of some witness and not others is entirely a matter of discretion with the trial court, and this discretion is not reviewable. This seems to be particularly true in the case of law enforcement officers. DeFranze v. State, 46 Ala.App. 283, 241 So.2d 125; Nichols' v. State, 267 Ala. 217, 100 So.2d 750; Elrod v. State, 281 Ala. 331, 202 So.2d 539.

■ Appellant did not testify and did not adduce any testimony in his defense. Where the affirmative charge was not re-

quested, no motion to exclude the state's evidence was made, no motion for a new trial was made, and no exceptions reserved to the oral charge, nothing is presented for review by this court. Eady v. State, 48 Ala.App. 726, 267 So.2d 516.

We have carefully searched the record for errors affecting the substantial rights of appellant and have found none. The case is due to be affirmed and it is so ordered.

Affirmed.

All the Judges concur.