356 So.2d 735 (1978)
Carson KELSOE
v.
STATE.
3 Div. 619.
Court of Criminal Appeals of Alabama.
February 21, 1978.
*736 Charles Tom Payne, Montgomery, for appellant.
William J. Baxley, Atty. Gen., and Jack M. Curtis, Asst. Atty. Gen., for appellee.
HARRIS, Presiding Judge.
Appellant was convicted of robbery and the jury fixed his punishment at fifteen years in the penitentiary. At arraignment, in the presence of counsel, he entered a plea of not guilty and not guilty by reason of insanity. After sentence was imposed he gave notice of appeal. He was found to be indigent and a free transcript was furnished him. New counsel was appointed to represent him on appeal.
The evidence presented by the State tended to show that on June 6, 1973, the Pak-A-Sak store located on Narrow Lane Road, just south of the Southern By-Pass, was robbed and about eighty-three dollars was taken. The robbery occurred between 1:00 p. m. and 1:20 p. m. on that date. Three young white men were subsequently arrested and charged with this robbery. They were the appellant, Michael Hall and Paul Schoffield. Schoffield pleaded guilty and testified for the State. Michael Hall was convicted for this robbery but he testified for appellant claiming that appellant did not have anything to do with the robbery.
According to Schoffield's testimony he and Hall met with appellant at his trailer home on Monday before the robbery on Wednesday and appellant made the suggestion that they rob this store. The plan was for Hall to actually rob the store while appellant and Schoffield waited in the getaway car less than a block away.
According to the testimony of Mrs. Maxine Henderson, the manager of the store, appellant came into the store a few minutes before the robbery and asked her for a nickel in exchange for five pennies so that he could make a telephone call. She took the pennies and gave him a nickel and appellant stood around in the store for ten to fifteen minutes before leaving. He did not use the telephone in the store while he was there.
Lavirt Henderson, Jr., the husband of Maxine Henderson, testified that he was stationed at Maxwell Air Force Base in Montgomery but worked part time for the Pak-A-Sak Company. He arrived at the store that was robbed around noon on that date and was working the cash register. He stated that a white man entered the store and came directly to him at the cash register about 1:20 p. m. on June 6, 1973, and pulled a pistol, cocked it, pointed it at him, handed him a paper sack, and told him to empty the register; and that he (Henderson) obeyed the order. Henderson stated the man attempted to disguise his features by wearing a blond wig with a green *737 headband around the wig. He further described the man as wearing sunglasses, a red and white striped shirt with an orange tank shirt over it and a gray coat covering the two shirts. After the robbery the man left the store and walked south on Narrow Lane Road.
Mr. Henderson's young son was in the store at the time of the robbery, and, when the bandit left, Mr. Henderson and his son got in a van truck and followed him. They saw the bandit get in a green Chevrolet Nova and leave at a high rate of speed. There were two men in the front seat of this car and the robber got in the back seat. As the Nova was fleeing through a residential section and Mr. Henderson was in close pursuit the man who had just robbed the store stuck a pistol out of the car and pointed it directly at Mr. Henderson. Mr. Henderson slowed his truck but kept following the fleeing car until they got back on Narrow Lane Road. At the end of Narrow Lane Road, Mr. Henderson stopped his van and called the Police Department, and when the officers arrived they took over the chase. Mr. Henderson testified that appellant was not the man who came in the store, pulled the pistol and took the money.
Paul Schoffield testified that he was a friend of the appellant and that appellant planned the robbery of the Pak-A-Sak store. He further stated that he was sixteen years of age on the day of the robbery and that Michael Hall was involved in the same robbery. He said the plan was for Hall to rob the store while he and appellant waited in the car. He said that appellant went into the store about thirty minutes before the robbery to get some change. He stated that Hall had a .22 revolver which he had gotten from appellant and that Hall put the wig, shirt, sunglasses and pants on in the car just before the robbery.
After the robbery and while being chased by the van Schoffield said Hall took off the wig, shirt, sunglasses and pants and put them in a bag which he gave appellant; that appellant took all of these items with him when he left the car at his sister's home. Shortly after appellant left the car Schoffield and Hall continued to drive until the car ran into a ditch because of muddy conditions on the roadway, and they left the car. They started walking and were later picked up by the officers.
Oscar Wright testified that on June 3, 1973, he was working at the Tenneco Station at the intersection of Fairview Avenue and Gaston Street; that between 12:00 Noon and 1:00 p. m. on that date he saw appellant and three other white men when they drove to the service station and bought a dollar's worth of gas and a six-pack of beer. They were in a green Chevrolet Nova. He stated that he knew appellant from waiting on him at the service station on previous occasions. He further stated that one of the men in the car was wearing a wig. He said that appellant was driving the car.
Sergeant L. D. Cox of the Montgomery Police Department testified that on June 6, 1973, he was on routine patrol when he received a radio dispatch about a robbery at the Pak-A-Sak store on Narrow Lane Road. He proceeded down Narrow Lane Road and found a green Nova automobile with a 5-tag on it and it had run into a mud hole and into a ditch. The car had been abandoned. He further stated that later that same day he participated in a lineup and Mrs. Maxine Henderson viewed the lineup and identified the appellant as the man who came in the store and asked her for a nickel in exchange for five pennies just shortly before the store was robbed. He further stated that Mrs. Henderson identified Michael Hall in a lineup as the man who robbed the store with a pistol.
Mrs. Maxine Henderson testified that she was the manager of the Pak-A-Sak store on Narrow Lane Road and that her hours of employment were from 7:00 a. m. until 3:00 p. m. She said that her husband and young son, David, were helping her in the store at the time of the robbery. Her husband was working the cash register on the day that appellant came into the store and asked her for a nickel change. She gave him a nickel for five pennies and the time was about 1:10 p. m. on June 6, 1973. She testified *738 that after she made the change appellant stood around in the store for five to ten minutes. She stated that about 20 minutes later she heard a noise and when she looked up she saw a man with a pistol at the cash register and the man turned toward her and said, "Freeze." The man got the money from the cash register and left the store. Her husband and son gave chase but did not catch the bandit.
Mrs. Henderson further testified that between 7:00 p. m. and 7:30 p. m. that same date, she attended a lineup where she viewed six or seven men and without hesitation or suggestions from anyone she identified appellant as the man to whom she gave a nickel for five pennies about 20 minutes before the store was robbed. She also made a positive in-court identification of appellant. She also identified Michael Hall in a lineup as the man who actually robbed the store.
Over appellant's objections the trial court allowed the testimony of Lawrence Eggers, given under oath and cross-examination, to be read to the jury. The proper predicate was laid before this testimony was allowed into evidence.
It was established by the testimony of Mark Rouleau, an investigator for the District Attorney's Office, that he had made a diligent search in his efforts to locate Lawrence Eggers. Rouleau stated, "All the information I had to go from was the 1973 police reports, and a transcript of the previous trial; and from that he gave, I had two addresses to go on, either 3030 Cleveland Avenue, or 917 Forest Avenue. The normal procedure for us to do was to check the power company first to see if they have an account in the individual's name. There was no account for Mr. Lawrence Eggers, either at 3030 Cleveland Avenue or 917 Forest Avenue; in fact, 917 Forest Avenue has been vacant since 1974."
He further stated that he checked with the water company and the telephone company and they did not have any listing for Eggers. He checked the City Directory and the telephone book all to no avail.
The Court ruled that the State had made a diligent effort to locate the witness and bring him to Court but that he could not be located and he would permit Eggers' previous testimony to be read to the jury.
From the record:
"The Court: Now, Ladies and Gentlemen of the jury: testimony is being read to you by the Assistant DA, the testimony given by a witness on a former trial; and the Court has ruled that that witness can't be located, can't be found, and is not available to be brought in here as a witness; and under the circumstances I have ruled that he is allowed to offer the testimony of this in a former trial.
"Now you can read it, and get it in the record."
"TRANSCRIPT
"LAWRENCE EGGERS
"The witness called by the State, and after having first been duly sworn to speak the truth, the whole truth, and nothing but the truth, took the stand and testified as follows:
"DIRECT EXAMINATION
"BY MR. THOMAS:
"Q. State your name, Mr. Eggers.
"A. Lawrence Eggers.
"Q. Where do you live?
"A. 917 Forest.
"Q. Do you know this man sitting over here?
"A. Yes, sir.
"Q. What is his name?
"A. Carson Kelsoe.
"Q. Do you know Hall and Schoffield?
"A. Yes, sir.
"Q. Do you know both of them?
"A. Yes.
"Q. All right. Did you have occasion to have a conversation with this man right here some time before June 6, 1973, at your home?
"A. Yes, sir.
"Q. Did he in fact come to your house on a rainy day?
*739 "A. To my house. I don't know whether it was raining or not.
"Q. He did come to where you were staying?
"A. Yes, sir.
"Q. What did he ask you for, if anything?
"A. Well, he visited my house on several occasions. What particular one are you meaning?
"Q. I will show you what has been admitted into evidence as State's Exhibit No. 4 and ask you if you recognize that?
"A. I do.
"Q. Whose is it?
"A. It is mine.
"Q. It is yours?
"A. It is.
"Q. I am speaking of the occasion of the last time that you saw that shirt. Was he there the last time you saw that shirt?
"A. Yes, but it wasn't at my house.
"Q. Wherever it was, were you talking to him?
"A. Yes, sir.
"Q. All right. Where was the shirt the last time you saw it?
"A. In my car.
"Q. In your car, all right. On that occasion did this Defendant ask you for anything?
"A. Yes, sir.
"Q. What did he ask you for?
"A. Asked me for my pistol.
"Q. For your pistol?
"A. Yes.
"Q. What kind of pistol do you have?
"A. A six-shot twenty-two caliber.
"Q. Is that a long barrel pistol?
"A. Yes, sir.
"Q. All right. What, if anything else, did he take from your car?
"A. This shirt.
"Q. This shirt. Do you recognize that shirt?
"A. It is one I wore playing soft ball in Greenville.
"Q. He asked you if he could take that shirt?
"A. No, sir.
"Q. What did he ask you?
"A. He asked me for my pistol.
"Q. Did he take the shirt?
"A. Yes, sir.
"Q. He took it with him that day?
"A. Yes, sir.
"Q. And that is the last time you have seen it?
"A. Yes, sir.
"MR. THOMAS: That is all. Thank you.
"CROSS EXAMINATION
"BY MR. ROBERTS:
"Q. Mr. Eggers, you say the Defendant got this red shirt from you?
"A. Yes, sir.
"Q. You knew Mike Hall and Paul Schoffield, didn't you?
"A. Yes, sir.
"Q. Mike Hall has testified under oath that he got the clothes, he got those items. He testified to this Court and to this Jury under oath that he got that red shirt.
"A. The best I can remember, he got it out of the front seat of my car.
"Q. We are not asking you for your best memory, we are asking you to testify under oath who got it.
"THE COURT: Were those two together?
"A. Which two?
"Q. Who was there when they got the shirt and gun?
"A. Paul, Mike and Carson.
"Q. Michael Hall, Paul Schoffield, and Carson Kelsoe?
"A. Say that again, please.
"Q. You are testifying unequivocally that Hall got that red shirt from you?
"A. No, I am not.

*740 "Q. What are you saying?
"A. I said they were all there.
"MR. ROBERTS: I would like for the Court Reporter to read back his testimony as to how that red shirt left his automobile.
"THE COURT: My recollection is he said the Defendant got it.
"MR. THOMAS: That is my recollection, too.
"Q. (By Mr. Roberts) So now you don't know who got the red shirt?
"A. Sir, I told you how the shirt got there.
"Q. Well, how did the shirt get away from you?
"A. Carson got it from the car.
"Q. Carson got it from the car. Are you positive of that?
"A. The best I can remember, yes, sir.
"Q. But you are not positive?
"A. It has been a long time ago.
"Q. And you are positive this pistol he borrowed from you was a six-shot?
"A. Absolutely.
"Q. I will ask you this, Mr. Eggers. Do you know where that pistol is now?
"A. No, I don't.
"Q. I will ask you this, Mr. Eggers. Did anybody during the recess, during the lunch recess, tell you where your pistol was?
"A. No, sir.
"Q. I will ask you if anybody told you in the witness room there that your pistol was in good condition?
"MR. THOMAS: Your Honor, I object to this line of questioning. It all calls for hearsay, unless he is trying to get at what another Defendant told him. Well, go ahead and get at it.
"Q. Did Mike Hall tell you not to worry about your pistol, that it was in good condition?
"A. Yes, sir.
"Q. Did he tell you that it was wrapped up?
"A. He said it could be.
"Q. Did he tell you that it was in good condition?
"A. He said it should be.
"Q. Should be in good condition?
"A. The pistol had a good bluing and good finish on it and it should be in good condition.
"Q. And that it was wrapped up?
"A. It could be wrapped up.
"Q. He didn't tell you that it was out in the pasture out behind the Broadway house on Narrow Lane Road?
"A. No, sir.
"Q. Out behind that house in a pasture?
"A. No.
"Q. Did Mike Hall tell you in the witness room during one of the recesses or during the lunch break that the gun was out in a pasture behind the Leonard's house?
"A. It is not in a pasture anywhere.
"Q. He didn't say that it was in a pasture?
"A. No.
"Q. How tall are you, Mr. Eggers?
"A. About six one.
"Q. About six one. And I notice you wear a band, and your hair is blond.
"A. Yes.
"Q. This was your pistol used in the robbery?
"A. I don't know. I loaned my pistol, and that's all I know. I don't know whether it was used in any robbery or not."
Detective B. J. Cleveland of the Montgomery Police Department testified that he went to the Pak-A-Sak store on Narrow Lane Road shortly after it was robbed; that he was present when Mrs. Henderson picked appellant and Mike Hall out of a lineup. He also testified that he was present at the home of appellant's sister when the headband, orange T-shirt, a wig and a pair of sunglasses were discovered in a field behind her house.
*741 Captain Grady Arnette testified that he arrested appellant the same day of the robbery and his appearance was one of disarray; that his pants were wet from his waist all the way down and had pull marks on them like he had been walking in briars. He further testified that appellant had streaks on his arms and that his boots were muddy and wet. He said it had rained real hard that day and he found fresh shoe or boot prints in the field behind appellant's sister's house.
Arnette identified State's Exhibit 10 as the boots appellant was wearing at the time he was arrested and that they were the same boots he was wearing in the lineup. He stated he obtained a search warrant for appellant's trailer home and he saw appellant walking toward the trailer. He arrested him around 4:15 p. m. the same date of the robbery and searched his person and found $55.00 in his pocket. A photograph was taken of the lineup of five white males. Appellant was number 3 in the lineup and he was still in this position at the time Mrs. Henderson identified him as the man who entered the store shortly before the robbery.
There was no marked disparity between appellant and the other four white males in the lineup as to ages, weight and height. They all were wearing brown colored shoes and blue or dark pants. A sketch was drawn of the lineup and the sketch and photographs of the lineup were introduced into evidence.
Also introduced into evidence were the wig, green headband ribbon, pair of sunglasses, one red and white shirt, one orange shirt, one gray coat, and photographs of the shoe or boot print leading to the place in the field of appellant's sister where the officers found the wearing apparel worn by the bandit at the time of the robbery under some straw in this field.
Appellant filed a written motion to exclude the State's evidence on the ground it failed to make out a prima facie case. This motion was overruled.
As above stated Mike Hall testified in appellant's behalf to the effect that appellant was not involved in this robbery. On cross-examination it was shown that he gave a statement to the officers in which he said that appellant planned the robbery. He was thoroughly impeached by his prior inconsistent statements. He admitted that he told the officers one lie after another lie.
Under the statute requiring corroboration of the testimony of accomplices to authorize conviction of a felony, the corroborative evidence need not be strong, nor sufficient of itself to support the conviction, the criterion being that it legitimately tends to connect the accused with the offense. Bibb v. State, Ala.Cr.App., 339 So.2d 1108; Goodman v. State, 52 Ala.App. 265, 291 So.2d 358; Cunningham v. State, 54 Ala.App. 656, 312 So.2d 62.
Nor need such corroborative evidence directly confirm any particular fact stated by the accomplice. Skumro v. State, 234 Ala. 4, 170 So. 776; Cameron v. State, 49 Ala.App. 482, 273 So.2d 242.
"Any circumstantial evidence is sufficient to corroborate if it proves that [the] accused was connected with the criminal act, or tends to connect him with the commission thereof, or if such connection may reasonably or clearly be inferred from the corroborative evidence; and where the accomplice is strongly corroborated by facts and circumstances connecting accused with the crime, a conviction will be sustained." 23 C.J.S. Criminal Law § 812(3), p. 109.
The trial court charged the jury they could not convict appellant on the uncorroborated testimony of Schoffield and Hall.
Schoffield told the officers where appellant hid the items worn by Hall at the time of the robbery. The officers found these items precisely in the field of the sister of appellant where Schoffield said appellant took them when they let him out of the car while they were fleeing after the robbery. This was clearly corroborative evidence of the testimony of Schoffield who was an admitted accomplice.
*742 Moreover, there is strong evidence from an independent source that on the very day of the robbery appellant borrowed a pistol from a friend and also took the red and white shirt from him at the same time. This red and white shirt was worn by Hall during the robbery and was found by the officers in the field that Schoffield said appellant carried the shirt to, along with the other items after the robbery. This independent evidence certainly corroborated some of the testimony of Schoffield.
This is a strong case of circumstantial evidence. Circumstantial evidence is entitled to the same weight as direct evidence provided it points toward the guilt of the accused. Woods v. State, Ala.Cr.App., 344 So.2d 1225.
The circumstances surrounding appellant are that he borrowed a pistol and took the red and white shirt worn by his confederate during the robbery, from a friend on the very day of the crime; he was positively identified as being in the store not more than twenty minutes before the robbery occurred; he was picked out of a lineup around 7:00 to 7:30 on the night following the robbery about 1:10 p. m. that day; he was the number 3 man in the lineup and his clothes were wet from the waist down; his boots were wet and muddy and the area where he hid the items worn by Hall during the robbery was swampy.
Appellant objected to the introduction of the testimony of Eggers given at a former trial. This testimony was clearly admissible under Pope v. State, 183 Ala. 61, 63 So. 71; Miles v. State, Ala.Cr.App., 343 So.2d 801. See McElroy's Alabama Evidence, Third Edition by Gamble, Section 245.07 et seq.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except BOOKOUT, J., who concurs in the result with opinion.
BOOKOUT, Judge, concurring specially:
I disagree with one point in the majority opinion, but concur in the result.
Schoffield, an accomplice, told the officers that appellant hid the items worn by Hall in a certain field. Officers found the clothing there, which the majority considers to be corroborative of Schoffield's testimony. With that point, I disagree.
Evidence to corroborate the testimony of an accomplice must not merely recite the details of the crime, but must connect the accused with the offense. Senn v. State, Ala., 344 So.2d 192 (1977). Finding a still where an accomplice said an accused was making whiskey was insufficient corroboration to connect the accused to the crime. Alexander v. State, 20 Ala.App. 432, 102 So. 597 (1925). Also, finding stolen items where an accomplice said an accused hid them was insufficient corroboration to connect the accused to that crime. Lotz v. State, 23 Ala.App. 496, 129 So. 305 (1930). This is for the reason that the accomplice knows the details of the crime and can recite them whether or not the accused was a participant in the offense. Here, as in Alexander and Lotz, supra, the fact that items are where the accomplice says they are in no way independently connects the accused with the offense. The accomplice himself may have hidden the items worn by Hall. "This is why it is incumbent upon the State to present evidence independent of the accomplices' which connects the defendant to the commission of the crime. Else, any guilty party is apt to implicate an innocent party in exchange for a grant of immunity from prosecution." Lindhorst v. State, Ala.Cr.App., 346 So.2d 11, at 15 (1977), cert. denied, Ala., 346 So.2d 18.
However, I concur in the result with the majority in that other evidence presented did corroborate the accomplice's testimony: (1) appellant's borrowing the pistol and shirt used in the robbery; (2) appellant's presence in the store minutes before the robbery; (3) lineup identification of appellant; and (4) the condition of appellant's clothing.