348 So.2d 804 (1976)
Hugh Otis BYNUM, Jr.
v.
STATE.
8 Div. 667.
Court of Criminal Appeals of Alabama.
June 29, 1976.
Rehearing Denied August 24, 1976.
*805 James M. Fullan, Jr., Roderick Beddow, Jr., and Albert C. Bowen, Jr., Birmingham, for appellant.
William J. Baxley, Atty. Gen., and James S. Ward, Asst. Atty. Gen., for the State.
TYSON, Judge.
The indictment charged Hugh Otis Bynum, Jr., and Charles X. Hale with the unlawful assault with intent to murder one Loy Campbell. The jury found the appellant "guilty of assault with intent to murder," and the trial court then entered judgment setting sentence at 20 years imprisonment as punishment. The appellant filed a motion for new trial which following a full hearing thereon, was denied.
Mrs. Irene Glass testified that she lived at 103 Hamlin Street in Scottsboro, Alabama, and was employed at the Jackson County Hospital as a nurse and anesthetist. She testified that she lived two houses away from the home of Mr. Loy Campbell on December 4, 1972. She testified that on the morning in question she was at her home and heard an explosion and ran out the door towards the home of Loy Campbell. She stated that she observed Loy Campbell seated in his automobile with the door open and smoke coming from the car. From the record:
"CONTINUATION BY MR. BAXLEY:
"A. I will say I thought he was unconscious; and Dr. Tommy Foster had followed right behind us.
"Q. Where you the first one there?
"A. Me and Minnie Cotten and Dr. Tommy Foster.
"Q. All about the same time?
"A. Yes.
"Q. Go ahead, please, ma'am.
"A. I opened the door, and I tried to get him out, but I could not get him out of the car. His legs were entangled in the debris. And Minnie Cotten and Dr. Tommy *806 were trying to get his legs freed so we could get him out. We were afraid of fire or another explosion.
"Q. Go ahead, please, ma'am.
"A. And it seemed forever, but it wasn't, the ambulance arrived; and they put him in the ambulance; and I ran home and called the operating room.
"Q. Did you give any first aid to him at that time?
"A. No.
"Q. Go ahead.
"A. I called the operating room to ask the operating room supervisor if she would send some doctors to the emergency room, that the ambulance was bringing Loy in and he would need assistance.
"Q. Did you observe his legs?
"A. Yes.
"Q. Describe what you saw, please, ma'am.
"A. Horrible, just barely hanging on by just a little bit of flesh, a little bit of skin; and I am sorry, Loy.
"Q. And did you find, describe the car, the condition of the car.
"A. It's real hard to describe the car, it was torn up so bad. The whole front end and the front seat, all the front part of the car was torn up completely. You cannot describe it. And the back, well, the back was still together; but the front was all torn up.
"Q. Was Loy conscious or unconscious?
"A. Unconscious, apparently.
"Q. And this was approximately 9 a. m.?
"A. Yes.
"Q. And this is located in Scottsboro, Jackson County, Alabama?
"A. Yes."
Porter Dawson testified that he was Fire Chief for the City of Scottsboro. He testified that in response to a call on the morning of December 4, 1972, he went to the residence of Loy Campbell at 107 Hamlin Street. He testified that Loy Campbell's automobile was in the driveway and that there had been an explosion at the scene. He described what he found as follows:
"Q. Could you describe for the jury the scene as you saw it at that time?
"A. Yes, sir; the car, the front part of the car was, of course, blown to bits; the fire wall, the dash, steering wheel, and all was blown back against Loy and his legs; and the doors were blown open; and Loy, at that time, was slumped toward the outside of the car, with Mrs. Glass supporting him; and of course, I proceeded on the opposite side of the car, the passenger side of the car, to work Loy's legs up out of the debris from the fire wall, the wiring, and installation, to get his legs up to where we could remove him from the car.
"Q. Did you observe his legs at that time?
"A. Yes, sir.
"Q. What condition did you find them in?
"A. One of his legs was blown off completely, between the foot and the knee; and the other leg was hanging, I believe you would describe it, by just by the skin.
"Q. By the skin?
"A. Yes, sir."
Chief Dawson further testified that he was familiar with explosions and had previously investigated them. He stated that he detected distinct odor of dynamite. He then described the condition of the residence and of the general vicinity as debris from the explosion had been blown over into neighboring yards and into the Caldwell School playground across the street. Chief Dawson identified several photographs made at the scene which were placed in evidence.
Agent Donald Barrett of the U.S. Treasury Department, Bureau of Alcohol, Tobacco, and Firearms, stated that he participated in the investigation of an explosion at 107 Hamlin Street in Scottsboro, wherein he determined a 1971 Pontiac automobile had been destroyed. He identified an aerial photograph of the scene of the Campbell residence made one week after the bombing. He testified that parts of the vehicle were scattered over approximately a block area and parts of the vehicle were found across the street on top of the Caldwell *807 Elementary School. Agent Barrett positively identified an M-6 military electric blasting cap fragment which was found underneath a 1971 Pontiac belonging to Loy Campbell. He testified that he continued to participate in the investigation of the bombing with State and Federal Agents and subsequently pursuant to information received from one Linda Darlene Sullivan, he discovered a cache of five sticks of dynamite wrapped with blasting caps similar to that used in the Campbell explosion, on September 24, 1974, behind the Carriage Apartments in Scottsboro. He stated that this dynamite was about 100 yards behind the apartments hidden in a hedge row. He identified a photograph made of the dynamite which was admitted in evidence and that he had taken this to Atlanta for testing and examination at the U.S. Government Laboratory there. He testified that certain pieces of "leg wire" were similar to that found on the motor area of Loy Campbell's Pontiac automobile on December 4, 1972.
Joe Morrison, Jr., testified that in December of 1972 he was employed at the Word-Morrison Funeral Home in Scottsboro. He testified that he also operated an ambulance service and on the morning of December 4, 1972, together with his attendant, had carried Loy Campbell to the Jackson County Hospital shortly before 9 o'clock that morning.
Dr. Durwood Hodges testified that he examined Loy Campbell in the emergency room of the Jackson County Hospital at about 9:15 on the morning of December 4, 1972. He testified that Mr. Campbell was in a semiconscious condition in excruciating pain and that both of his legs below the knee had been blown off and there were injuries to his abdomen and face with powder burns to his body. He stated that both legs had certain metallic fragments and he had to amputate both legs that morning.
From the record:
"Q. What was the nature of the injuries to the legs that required that procedure?
"A. Well, the right leg, as stated was destroyed, the soft tissue and the bone, and all circulation, to a degree that you had to amputate above the right knee. Now, the left leg, there was a 50-50 chance that we might save this joint. It's important to save a joint because you can get a prosthesis, an artificial leg, that works better. When you go above both knees, it's much more difficult to fit these prosthesis and get around. If you can save a joint, you want to do everything you can to, not knowing that we could but we wanted to try to, rather than sacrifice it. Later on, it had to be removed.
"Q. For what reason did it have to be removed later?
"A. Because it had some, too much damage to it, too much explosive damage; and it had some foreign bodies in it, also.
"Q. All right, Doctor, before you performed any of the amputation, the original amputation in both legs, were both legs practically blown off at that time?
"A. Yes, sir."
Billy Ray McCrary testified that he lived out Highway 72 near Hollywood in Jackson County, Alabama. He testified that he was released from the federal prison in Atlanta where he had been incarcerated on a liquor violation charge. He was released November 15, 1972. He returned to Jackson County on November 16 and went to his father's home. He stated within two days or three days of his return the appellant Hugh Otis Bynum came to see him alone and that he was driving a 1970 white Buick Electra 225.
From the record:
"Q. Now, Billy Ray, you just tell the Court and jury exactly what happened and everything that happened from the time after you got out of the penitentiary when you first saw Hugh Otis Bynum.
"A. He come up to my father's house; I don't know; I think it was within a week after I got out, and asked me ifHe said, `I got some people I want to get killed.'
"Q. Start and tell everything, when he first came up, what you did, where you went with him, and anything.

*808 "A. When he first come up, why, my mother said, `There is Hugh Otis out there;' and I got up and went to the door and went outside; and by that time, he was outside the car; and he shook hands with me and asked how I was doing and when I got out; and he said, `I got some people I want to get killed;' and I said, `Who is it?' He said, `Loy Campbell, Bob Collins, J. Black, and John T. "Mayor" Reid.'
"Q. What, if anything, did you tell him, if anything, then?
"A. I told him I didn't know nobody; I hadn't been out fooling around; I would look around and see if I could find somebody. He said he had $2,000.00 each.
"Q. He said what?
"A. He had $2,000.00 for each one of them.
"Q. Hugh Otis Bynum said that?
"A. Right.
"Q. And you told him you would look and find somebody?
"A. Right.
"Q. What else did he say then, if anything?
"A. We fooled around there and talked a while; I don't know; he talked about several different things. He said he didn't care how they were dead, just so they were dead.
"Q. Tell anything else you remember.
"A. I said, `Why do you want these people killed?' He said, `They cost me $92,000.00," and I said, `How did they cost you $92,000.00?' And he said, `I shot some niggers over in my pasture,' and said, `they, Bob Collins, put me in jail,' and said, `the niggers burnt my house, my barns, and my hay, and done away with some of my cattle.'
"Q. He said that cost him $92,000.00?
"A. Yes, sir."
McCrary stated that a few days later he went to see Charles X. Hale and told him "Hugh Otis has got some work for you to do." Continuing, "He wants you to kill Loy Campbell, J. Black, Bob Collins, and Mayor Reid." Continuing, "He said he would give you $2,000.00 per job." He stated that Hale said when could he meet with Bynum and that he then arranged a meeting at Tom's Cafe in downtown Scottsboro. They left the cafe and got in Bynum's car. From the record:
"A. We come out, the three of us, Hugh Otis Bynum, Charles Hale, and me, come out and got in the car; and he told Charles that he would give $2,000.00 to kill Loy, Bob Collins, Mayor Reid (John T. Reid), and J. Black.
"Q. $2,000.00 each?
"A. $2,000.00 each, which was a total of $8,000.00.
"Q. Which he, who is it that said that?
"A. Hugh Otis Bynum.
"Q. Said it to you and Charles Hale?
"A. Yes, sir. He, Charles, he was, he sat in the car; I stayed in the car with them probably fifteen minutes; I got out of the car and Charles stayed in the car with Hugh Otis.
"Q. What did you say, going back to Hugh Otis, when you first saw him in Tom's with Charles Hale?
"A. I said `Hugh Otis, I got you a man here.' And he said, `Well, here's ole Charles back.'
"Q. And then you went outside?
"A. Right.
"Q. Go ahead.
"A. We went outside and he told, Hugh Otis told Charles he would give him $2,000.00 each to kill Loy Campbell, Bob Collins, Mayor Reid, and J. Black.
"Q. About when was this, the best of your knowledge?
"A. It was shortly after Hugh Otis came to my father's house.
"Q. It had been some time in the later part of November?
"A. Yes, sir.
"Q. All right, how long did Hugh Otis and Charles Hale have a conversation there in the car after you got outside?

*809 "A. I would say fifteen or twenty minutes.
"Q. And then, what happened?
"A. Charles got out, went to his car; I was standing down on the corner; I don't remember who I was talking to; Charles went back to his car and left; and I went back and got in my car and went down to the pool room.
"2. After that and before, do you recall the day when the bomb went off in Loy Campbell's car?
"A. Yes, sir; I don't know the date; I know it was on First Monday and First Monday in December of 1972.
"Q. Well, after that conversation that you just testified about and before First Monday in December, did you see Hugh Otis Bynum again or have any conversation again with him, with reference to killing any of these people you named?
"A. Yes, sir.
"Q. What about Charles Hale?
"A. I saw Charles Hale the night, on Sunday night before the bombing the next morning.
"Q. Where was it?
"A. Down at my ex-wife's house on Hembree Street.
"Q. Did Charles come down there, or did you pick him up, or what?
"A. Charles, I believe Charles came down there. Charles lived there at the back of my ex-wife's house.
"Q. And I believe he came over there that Sunday night before the bombing?
"A. Right.
"Q. What, if anything, did Charles Hale say? Was Hugh Otis Bynum present then?
"A. No, sir.
"Q. What, if anything, did Charles Hale say then?
"MR. BOWEN: We have the same objection.
"THE COURT: Overrule.
"CONTINUATION BY MR. BAXLEY:
"A. Charles Hale said he was going, he said, `I am going to get Black tonight; I am going to get Loy Campbell and Bob Collins.'
"Q. He said what now?
"A. He said, `I am going to blow up Loy Campbell and Bob Collins tonight.'
"Q. What did you say to him?
"A. I told him, I said, `Well, I don't know;' I said, `You have the job; you know what to do.'
"Q. Did you tell him anything about not blowing hisself up?
"MR. BEDDOW: We object to him leading and suggesting to this witness. He can ask him.
"THE COURT: Don't lead.
"CONTINUATION BY MR. BAXLEY:
"A. I told him, I said, `Don't fool around and blow yourself up.'
"Q. All right, what time did Charles Hale leave that night?
"A. I don't really know what time Charles Hale left. I was there talking to Alfred Hinkle and my next to oldest son, Robert.
"Q. Did they hear this conversation with Charles Hale?
"A. No, sir, they didn't; Charles Hale called me outside.
"Q. You had this conversation outside with Charles Hale?
"A. Right outside the door.
"Q. What time was this, to the best of your memory?
"A. Not too long after dark.
"Q. Did you see Charles Hale after that conversation that night, again on that night, I mean?
"A. No, sir.
"Q. When was the next time you saw Charles Hale?
"A. The next time I saw Charles Hale was when they had been out to the convict camp, State Highway Department, investigating.
"Q. How many days after this Sunday night was that, if you know?

*810 "A. I don't know.
"Q. But it was after the bombing then?
"A. Right.
"Q. Did you see Hugh Otis Bynum that night, the night before the bombing, on Sunday night?
"A. No, sir.
"Q. When was the next time after that night that you saw Hugh Otis Bynum?
"A. I saw Hugh Otis Bynum on First Monday in front of Tom's Cafe over on the square.
"Q. In other words, the next day?
"A. Yeah, it was around 10 or 11:00, I guess, in the day.
"Q. Do you know when the bomb went off?
"A. No, I don't.
"Q. Did you learn when you saw Hugh Otis Bynum, did you learn then that the bomb had gone off?
"A. Yes, sir.
"Q. Tell everything that was said and done and in your conversation with Hugh Otis Bynum on that day.
"A. Well, that morning, when I was coming to town, I come around by Garrett Thomas' Shell Service Station. I pulled in there; and he said, `Loy Campbell got blown up.'
"MR. BOWEN: We object to that.
"THE COURT: Sustain.
"CONTINUATION BY MR. BAXLEY:
"Q. Don't tell anything anybody else said to you except what you said and what you did and where you saw Hugh Otis Bynum.
"A. Hugh Otis Bynum was over in front of Tom's Cafe. I was walking down the street, and he come across the square here, went over to Tom's; I was standing there talking to John Frank Hurt, Roy Barclay, and George Hunter Payne.
"Q. You were talking to them?
"A. Yes, sir.
"Q. Hugh Otis Bynum wasn't there?
"A. Yeah.
"Q. Where was he?
"A. Standing over close to Tom's door.
"Q. Was he in the conversation with you or somewhere else?
"A. Standing over to the door about as far as from me to you.
"Q. What happened then, if anything?
"A. He nodded for me to come over.
"Q. By `he,' who are you talking about?
"A. Hugh Otis Bynum.
"Q. This defendant right here?
"A. Yes, sir.
"Q. What happened?
"A. I walked over there, and he said, `Well, we got the job done,' and I said, `He might not die,' and he said, `Oh, yeah, he will bleed to death.'
"Q. Who said that?
"A. Hugh Otis Bynum.
"Q. Go ahead, about everything else that was said there.
"A. He said, `We might ought to clear out from around here; they might try to put things together around here, seeing you around me; and you just got out of the penitentiary,' and said, `We might ought to clear out.' I left and come back over to the square, and I don't know how long I stayed around over here; I don't know if it was that day or the next day, but some agents started questioning.
"Q. You mean law enforcement officers?
"A. Yes, sir.
"Q. And just tell the next time that you saw either Charles Hale or Hugh Otis Bynum.
"A. Well, I saw Charles Hale when they started to investigating; and he said, `We might not ought to be seen together,' and said they had been out to the convict camp wanting to question him. He said, `We might ought to stay away from each other a few days.'
"Q. Who are you talking about?
"A. Charles X. Hale.
"Q. When was this?

*811 "A. Shortly after the bombing."
McCrary thereafter testified that he saw Hale again a few days later and Hale asked him when he was going to get paid. He stated that the appellant Bynum met with them near Tom's Cafe a couple of weeks after December 4, 1972. He stated that they drove out to an old house on Mountain Street and stopped. He stated Bynum got out of the car, unlocked the trunk and got out an envelope. He stated that Bynum gave him the envelope which contained 20 $100.00 bills and said, "Let's stay apart a few days. Don't get anybody else right now. Let things kind of die down." McCrary stated that he gave Hale $400.00 of this money and kept the remaining $1,600.00 as Hale owed him this. He stated that a few days after this he had a further conversation with Hale who stated that on the night of December 3, 1972, he had driven first to Sheriff Bob Collins' home to put a bomb on his car but a dog had barked and scared him off. He said that he then left and went down to the Campbell residence where he parked, got out and crawled under the car and placed the dynamite in Campbell's automobile and connected it. Thereafter McCrary testified he would meet from time to time with Bynum over almost a two-year period in which they had several conversations pertaining to getting someone else to finish the job.
From the record:
"Q. Well, you sit up there and tell what conversations you had, now.
"A. Every time the man would come around, he would ask me if I found anybody to kill Bob Collins and finish the job on Loy Campbell and Mayor Reid and J. Black.
"Q. Would he say anything, or did he have an additional reason to be mad at them or talking about the same reason, or what would he say, if anything?
"A. He said, `Reid's trying to run the town.' He said his people was responsible for this town.
"Q. Whose people, now?
"A. Hugh Otis Bynum's people.
"Q. Hugh Otis Bynum said his people were responsible for the town?
"A. Yeah, and he said he wasn't going to let him run this town like that."
McCrary testified that in November of 1974, he brought a man named Poarch to Bynum and that Bynum offered him $5,000.00 to get Sheriff Collins. (R.P. 110-111) He also testified that Bynum made a part payment of $3,000.00 for this and that he gave half or $1,500.00 of this to Poarch.
Jimmy Dewayne Evett testified that he did janitorial work at Caldwell Elementary School. He testified that he found a breather cap under a bush in the school yard and turned it in to the school principal.
Larry Luckey testified that he was a Treasury Department Agent who participated in the investigation of the Campbell bombing on December 4, 1972. He identified "fragments of an electric blasting cap" found at the blast scene which were taken to the Atlanta laboratory for examination. Also identified where fragments of leg wire and insulation material.
Agent Robert Miller, also of the Treasury Department, identified certain electric military blasting caps which he obtained from the State Highway Department and took to Atlanta to the laboratory for examination. He also identified the carburetor from Mr. Campbell's 1971 Pontiac and air filter assembly which were also delivered to the Atlanta laboratory for examination.
Frank G. Kendall testified he was a fingerprint expert from the U.S. Treasury Office and had attempted to lift "latent fingerprints" from some of the automotive parts and compare them with the fingerprints of Hale, McCrary, and others, but was unable to come up with a match.
Wendell Britt testified that he was office clerk in charge of the records in the Scottsboro Highway Department Office. He identified certain Highway Department records which showed that Charles X. Hale was employed by the State Highway Department. On September 25, 1972 and resigned February 16, 1973. Also identified were records which reflected the jobs where Hale was working during this interval and the *812 shipment of dynamite and caps to the site of certain jobs where Hale was employed at that time. This witness also stated that the accountability for inventory was not so strict at that time and that certain changes had been made which would reflect shortages in inventory.
W. R. Collins testified that he was Sheriff of Jackson County, Alabama, and had been such for the past nine years. He testified that he had known the appellant Hugh Otis Bynum for the past 15 to 18 years and frequently saw him in downtown Scottsboro. He stated that for a number of years the appellant would oftentimes drop by his office and visit but that after a trial in 1969, wherein Bynum was charged with a shooting of two colored boys, their relationship changed. He testified that Jay Black was the District Attorney representing the State of Alabama in this case and that Loy Campbell was one of the attorneys who defended the two men. After the trial was over, he testified that he only would occasionally see Bynum and that he would rarely stop and chat as he formerly did. He further testified he knew one Billy Ray McCrary and many times observed McCrary and Bynum riding around in an automobile together during the period of December 1972-1974. Sheriff Collins further testified he participated in the arrest of Bynum in December of 1974, with other State and Federal officers and that the appellant was at a filling station operated by McCrary out Highway 72 about five miles from Scottsboro when arrested. He testified the appellant had $331.47 in his shirt pocket and that this was "folded longways and in the middle." He stated that the appellant had a check for $550.00 made payable to Tom Sisk and endorsed by Sisk from Billy Ray McCrary, dated June 26, 1974, in his billfold.
Mrs. Annie Ruth McCrary testified that she was the mother of Billy Ray McCrary and that he came to live with her and her husband in the middle of November, 1972, upon his release from the federal penitentiary in Atlanta. She testified she knew Hugh Otis Bynum when she saw him and that within ten days after his release from federal prison, Bynum drove up to their home and asked for McCrary and thereafter she saw them together on several occasions.
Billy Ray McCrary was cross-examined extensively concerning the immunity granted him by the Attorney General in return for his testimony in this cause and on each aspect of his direct testimony. In this connection McCrary stated on cross that it was approximately a week after November 17th, that he saw Charles Hale and that he said he would do the job. McCrary admitted that he had never contacted any law enforcement officials with reference to Bynum's offer and on the night before the Campbell bombing, McCrary stated that Hale indicated, "I am going to get Bob Collins and Loy Campbell tonight." McCrary further testified that after being interviewed at the State Attorney General's Office, that he was sent back to Scottsboro with State investigators and that they contacted Bynum again representing to Bynum that the investigator was another man who would help him carry out his plan. Various portions of this taped conversation were then placed in the record through cross-examination. McCrary also explained that he had sold Charles Hale some pills, "for $1,600.00" which were in a half gallon container and that after receiving the $2,000.00 from Bynum in $100.00 bills, that he kept $1,600.00 and gave Hale $400.00 payment. He stated that Hale left Scottsboro in early 1973 and he did not see him for some time thereafter. McCrary further testified that Bynum had given Hale a Remington 30.06 rifle in 1973 and a box of shells together with a scope for the rifle. He stated that this was to be used by Hale to get the Sheriff. He also testified that shortly before Bynum's arrest when he was with the undercover officer, Bynum had given him $200.00, being two $100.00 bills folded lengthwise in the middle.
Lonnie Grider testified that he owned a business in Jackson County and had known the appellant and McCrary for a number of years. He testified that he saw them passing his place of business, "The Blue Bonnet" riding in Bynum's automobile on December 4, 1972.
*813 Mr. Lloyd Erwin of the U.S. Treasury Department identified certain materials which had been submitted to him for testing as coming from the Campbell bombing. He stated in his opinion he found a sulphur content and that he was able to identify nitroglycerin from some of the blasting caps and that in his opinion, "dynamite had been used."
Mr. Loy Campbell testified that he was a practicing attorney in Scottsboro and had known the appellant, "about 23 years," and that he had known Billy Ray McCrary "over 22 years." He stated that for a number of years he had done legal work for Mr. Bynum and had formerly done some legal work for his father's estate. He testified that in April, 1971, he had defended two men charged with the attempted arson of a building located on some property known as "Bynum Ridge." He stated that the two men's names were Bates and Price. He testified that about two weeks later the appellant Hugh Otis Bynum was the defendant in a case wherein he was charged with a shooting incident arising from this and that this was tried about two weeks later. Mr. Campbell stated that after the trial of these cases, the appellant Hugh Otis Bynum "never came by my office again." With reference the morning of December 4, 1972, Mr. Campbell stated:
"A. Okay; I got up about 7:00, probably; I sent my daughter, she was six years old at that time, going to school at Caldwell, just across the street; she went to school about 8:00; and I stayed around the house, got dressed, and started to work. It was a First Monday, and I went out to get my car around 9:00; and I got in the car and turned the switch on and boom! It was the only thing I can remember; I was trying to get out of the automobile; I thought it was on fire, the flames had shot up into my face; and that's all. The next thing I remember, I was at the hospital and Dr. Hodges was slapping around on my face and trying to wake me up, and telling me he had to take my legs off."
Mr. Campbell further testified, after identifying several photographs of his home, the repairs came to $2,675.00, and that his Pontiac automobile was a total loss. He testified that he had not done any legal work for Mr. Bynum since April of 1971 and had only seen him after those trials on one occasion at the courthouse and when he mentioned to Bynum that he had "come out pretty good," Bynum's reply was "not so damn good."
He testified that about a month or six weeks after getting out of the hospital in 1973, he was seated in the Liberty Restaurant with his brother "Bunk" Campbell, and the appellant passed by the table and stopped near the cash register. From the record:
"Q. Tell the Court and jury, please, sir, everything that was said between you and Hugh Otis Bynum on that occasion.
"A. All right; he came by the table that my brother and I were eating lunch; and again, he had been eating over at the big table where he had the first time I saw him; and he came by and stopped, and he was a little bit behind me; and he said, `Your buddy sent Barrett to see me,' and he said yesterday or some time; I don't know; it had been within a few days.
"Q. Did you know what he was talking about?
"A. No, sir; I believe he said `buddy' something, and he said, `the sheriff;' and then he said, `Barrett asked me; Barrett said the sheriff told him that I hired Billy Ray McCrary to blow you up;' and I said, `Hugh, I hadn't heard that;' and I said, `Did you?' And he just smiled and turned around and walked on up to the cash register and walked on out; he didn't say `yes' or `no' or make any kind of reply of any kind."
On cross-examination Mr. Campbell testified that he had stated to Hugh Otis Bynum shortly after the arson incident in August of 1969, that he planned to represent Bates and Price. He also testified that Mr. Beddow had defended Mr. Bynum in the case involving a shooting incident with the two men. With reference Mr. Beddow's representation, Mr. Campbell stated Mr.
*814 Beddow had contacted him and asked him to look over the jury list and that this was standard procedure for an out of town attorney. He stated that he had indicated his approval of certain prospective jurors to Mr. Beddow and that Bynum had subsequently been convicted of assault and battery and fined $500.00, and later told Campbell he wasn't "too damn lucky."
William White testified that he lived at Route 4, Scottsboro, and had known Billy Ray McCrary for about ten years. He testified that on January 27, 1973, McCrary came by and paid him $1,000.00 as payment on a house trailer and lot and that he was paid in ten $100.00 bills.
Paul Chaney testified that he sold automobiles in Scottsboro. He testified that in January of 1973 he sold Billy Ray McCrary a 1967 Pontiac for $350.00 and that he was paid with three $100.00 bills and one $50.00 bill.
Keith Smith, investigator for the Scottsboro Police Department, testified he had known both Bynum and McCrary approximately four years prior to 1972. He testified that prior to the date of the bombing and after McCrary's release from federal prison, he drove out by McCrary's parents' home on Highway 72 east near Holywood and saw the appellant Hugh Otis Bynum drive up. He testified that Billy Ray walked over to the car and had a conversation with Bynum and that after the bombing, he saw them together near Tom's Cafe talking on several occasions.
Troy Ferguson testified that he was a Deputy Sheriff of Jackson County in December of 1974. He testified that he brought Billy Ray McCrary to Montgomery and subsequently back to Scottsboro where he was turned over to Major Dixon and two undercover agents of the Department of Public Safety at the Scottsboro Holiday Inn. He stated that McCrary was searched and other than some small pocket change, he did not have any money with him, this being on the evening of December 6, 1974.
Sheriff W. R. Collins testified that at the time of the appellant's arrest on December 6, 1974, he removed two $100.00 bills folded lengthwise in the middle from the pocket of McCrary after McCrary's meeting with Bynum that evening.
Linda Darlene Sullivan testified that she was serving time in the federal prison at Lexington, Kentucky, on a charge of bank robbery. She stated that she had been co-defendant with Charles Xavier Hale in the robbery of a bank in Mims, Florida. She stated that Hale had a 30.06 rifle with a scope and that he told her he had gotten the rifle from Hugh Otis Bynum. She testified that she had been reared around Sand Mountain and had lived with Hale for about a year. She testified that on the first evening that she saw the rifle Hale had gotten her to ride in a car with him "out to Tupelo Pike" and that he told her Bynum had given him $150.00 which bills were folded lengthwise in the middle and had asked Hale to "kill the sheriff." She testified that she saw Hale go into Tom's Cafe and return with the $150.00 in $50.00 bills folded in the middle and that Bynum had stated that they "had a job to do" and that was to "kill Billy Ray McCrary because he knew too much." She further testified that Hale asked her if she knew Jay Black and she said yes and that he got her to ride to Fort Payne with him and show him where Black lived. She testified that Hale told her that Bynum wanted Collins, Campbell, Jay Black, and one more killed and had later told her where he hid five sticks behind the Carriage House Apartments. She further stated that he told her he had gone by the Sheriff's house to put the dynamite in his car and that a barking dog had scared him off and that he then went to Campbell's house and put the dynamite in the car and had cut his leg as he crawled out from under it.
Isaac Roberts testified he lived at 602 Tupelo Road in Scottsboro. He stated he was the uncle of Charles X. Hale and had known the defendant Hugh Otis Bynum, Jr., between 40 and 45 years. He stated that Hale was arrested in Florida on the bank robbery charge in August of 1974. He stated that some time prior to that time Bynum had come by his home one Sunday *815 morning and asked about Hale's whereabouts and told him that he could get in touch with him "at Tom's Cafe," and that he would like to help him if he could. He stated that later Bynum returned, and wanted to know about Hale's whereabouts and asked him to get in touch. He stated that on a third occasion, after Hale had been arrested, Bynum came to see him and said that he noticed Hale had been arrested robbing a bank in Florida, and that they had caught his girl friend, and that he told Bynum, Hale would not be in touch with him, and Bynum said, "Tell Hale to go to Mexico if he has to." He testified that Bynum returned on a fourth occasion after Hale's arrest, and asked if anybody had been up there to see him, and that he Bynum had been asked to take a lie detector test, and they were trying to tie me up in that bombing."
Harold Wilson testified that he was an undercover agent with the Alabama Department of Public Safety with which he had been associated for 11 years. He testified that he met Billy Ray McCrary in Montgomery and together with Lieutenant Taylor of the Public Safety Department came to Scottsboro. He stated that Lieutenant Taylor taped a transmitter to his body and they left the Holiday Inn at Scottsboro, and went to Tom's Cafe to meet with Hugh Otis Bynum. Wilson stated that Bynum came in, ordered a cup of coffee and asked Billy Ray when "he got out." He stated that McCrary replied, "Hugh, this is a man here that I have been hunting to do the job," and that they left Tom's Cafe and went and got into Bynum's automobile. He stated that McCrary drove with Bynum on the front seat and that they parked over on the back side of the Holiday Inn. Thereafter there was a discussion with Bynum with which Billy Ray said, "You want four, don't you, Hugh?" to which Bynum replied, "Yeah" and that after discussing the price, Agent Wilson stated that he would take $500.00 down and come back for the rest and that Billy Ray said, "Could you come up with $200.00, Hugh?" Bynum replied, "I haven't got the money right now," that I am "spent out." Thereafter a discussion ensued in which Bynum stated that the Sheriff had cost him $92,000.00, for "shooting two niggers on his property," and that it had cost him his house, two barns, and all his cattle at a commercial price. Wilson then said, "If he's cost you this much money, $2,000.00 more is not worth him," and that Bynum laughed. He stated that the men drove back to Tom's Cafe and that Bynum told them to drive around the block and when they returned, Bynum came out and finally told them that "he wanted it done, but that if the poor old Sheriff came up dead, they would trace it back to him," and further that Bynum stated, "I wouldn't give a damn if it would have been done a month ago."
The appellant's motion to exclude the State's evidence was overruled, following argument.
H. Jack Milnes testified that he was Personnel Officer with the Tennessee Valley Authority. He identified an application for employment filled out by Billy Ray McCrary on December 30, 1974, in which McCrary indicated "he had had a great deal of experience as a powder man."
Don Barrett was then recalled and testified that he had interviewed Billy Ray McCrary three or four times. He stated that he first saw McCrary a few days after the Campbell bombing on December 4, 1972 and that at that time he denied any knowledge of the bombing and also did this on a second occasion wherein he sought to interview him about a month later. Mr. Barrett also testified that he had seized a 30.06 rifle from the residence of Mr. Bynum and had it examined for fingerprints and that there were "no latent prints." He testified that he was present on the night of December 6, 1974, at about 7:30 in the evening when the appellant was arrested at a service station trailer being operated by Billy Ray McCrary on "Martintown hill" about eight miles east of Scottsboro, that he was accompanied by Sheriff's Investigator Tubbs and Special Agent Blankenship.
Tom Sisk testified he owned Tom's Restaurant located on the north side of the *816 square in Scottsboro. He stated he had known Hugh Otis Bynum and that he frequently came to his place of business. He stated that his business was not open on Sundays but that Bynum would eat at his restaurant almost every day and sometimes get telephone calls there. He stated that on about November 16 or 17,1972, McCrary had telephoned Bynum at his cafe and stated that he wanted to see Bynum, that he had just gotten out of the pen. He stated that Bynum did not leave immediately at that time, that Bynum often carried money and would fold it lengthwise, in the middle. He stated that McCrary had made out a check for $550.00 to him and that he carried it to the bank and presented it for payment and was told that it was no good and that he had given it back to Bynum in December 1974.
The appellant then presented a number of witnesses who lived in Scottsboro and who knew Billy Ray McCrary and testified that his reputation was bad and that his reputation for truth was bad. The Circuit Clerk Charles W. Wann was called to the stand and testified that a grand larceny warrant obtained on August 17, 1973, was nol prossed December 30, 1974, that an escape case and a V.P.L. case were pending against McCrary. On cross-examination Wann explained the grand larceny case arose from an incident involving an automobile belonging to a Joyce Turner McCrary and had been nol prossed after "husband and wife sometimes get back together."
The appellant presented the testimony of Lilah Gilliam McCrary who testified that she was the former wife of Billy Ray McCrary; that they were divorced in January of 1973 and that there were six children born of this union. She testified that during December of 1972 and in 1973, that McCrary had come to see her after getting out of the federal penitentiary and that McCrary had stated in her presence "he was going to kill some S.O.B.'s that had made him suffer so much." She stated that McCrary indicated to her that Loy Campbell and Sheriff Collins had kept him from getting an early parole. The witness stated that on the night of December 3, 1972, Charles Hale and Billy Ray McCrary had been at her home and that after other people left, Hale got up and looked at Billy and said, "I better go, I have a heavy date," to which McCrary replied, "You better be careful, you S.O.B." and that Hale then left. She also testified that she had put her hand in a shirt pocket one night prior to December 4,1972, and that there were some "real shiny objects in it" and McCrary told her to put them back, that they will "blow you up." She also stated that a few days after the Campbell explosion on December 4, 1972, McCrary had told her not to mention Charles Hale's name or "you all would get blowed up too."
On cross-examination Mrs. McCrary testified that after the Campbell bombing she did not tell any law enforcement people about which she suspected but finally went to Campbell's brother, H. R. "Bunk" Campbell and told him that Billy Ray was involved. She said that she told Bunk Campbell while Loy Campbell was in the hospital.
George Hunter Payne was called by the defense and denied selling McCrary any $400.00 worth of pep pills.
Hugh Otis Bynum, Jr., testified he was 60 years of age and a lifelong resident of Scottsboro. He testified that he awakened in his home shortly after 5:30 on the morning of December 4,1972 and remained there looking at his morning paper until about 7:30. He then went to Fred Casteel's Variety Bake Shop where he had breakfast, then drove near Tupelo Pike to look at some cattle. He returned to downtown Scottsboro between 9:20 and 9:30 and went to Tom's Restaurant where Mrs. Sisk told him, "Hugh, there's been an explosion down near the school." He stated that this was a "First Monday in Scottsboro" and that he listened to the bulletins on the radio. He stated he went by his home later that morning and that at about 11:30 had dinner at the Liberty Cafe and went back by Tom's Cafe later where he ran into Billy Ray McCrary, George Hunter Payne and John Frank Hurt. He stated that they were *817 having a conversation on the sidewalk. He said that he left them shortly after 1 o'clock and drove out to Tupelo Pike to see about his cattle and that it was some time after 3 o'clock when he saw Ed Cornelison and Billy Charles McCord and had a conversation with them about some feed for his cattle. He stated that he returned to Scottsboro and went by Tom's Cafe and remained there having supper until he went home and went to bed some time after 7:30 that evening. He said that the only time he saw McCrary that day was on the sidewalk near Tom's Cafe. He stated that he remembered getting a call from McCrary at Tom's Cafe one day soon after McCrary got out of the federal pen and that McCrary had asked him to loan him some money so he could go into business. He further testified that at no time had he stated to McCrary, "Billy, I want four people killed. I want to kill Sheriff Collins, Loy Campbell, J. Black, or Mayor John T. Reid." He denied offering $2,000.00 each for having them killed. He said that he ran into McCrary one Sunday morning in downtown Scottsboro and later saw him one evening near Tom's Cafe parked in front of Rupert Word's Furniture Store. He stated that he did see Charles Hale in the automobile with McCrary at this time. He stated that later he had a phone call from McCrary and that he wanted him to go in on $10,000.00 worth of bonds in DeKalb County and that he told McCrary that he didn't go in on bonds. Bynum stated that he only saw Charles Hale once and that at no time did he tell Charles Hale that he wanted four people killed, offering $2,000.00 each for the four men. He further denied giving a 30.06 rifle or $150.00 to Hale and denied telling anyone that he would remember Hale in his will, that his sisters were the ones who were the beneficiaries.
With reference to his conversation with Hale's uncle, Mr. Roberts, he said that he told him that if Charles were guilty of bank robbery, that he wouldn't blame him for going to Mexico. He stated that he had had a stroke in 1950 and that he had difficulty speaking and that for this reason did not have a telephone in his home.
He stated he had been contacted by Federal Agent Barrett and had told him he could have a fingerprint test and gave him some in the fall of 1974, but that he would not take a Polygraph test. He testified that he had a "rare type rheumatism" and that for this reason, being partly crippled, he always folded his money lengthwise in the middle. He testified that he had once loaned Hale a hundred dollars to buy an automobile but that he had never loaned or given him any other money. Bynum stated that Agent Barrett had told him it was said that he Bynum had given McCrary a lot of money to bomb Campbell and that when he saw Bunk and Loy Campbell at the restaurant, he told them, "No, I wouldn't do a thing like that." Bynum further claimed that he had recommended the Campbells to other people as lawyers. He stated that shortly before he was arrested, he gave McCrary $200.00 because McCrary said, "I have just gotten out and I am broke and I haven't even seen Joyce," that, "I need a loan."
On cross-examination Bynum admitted backing McCrary in some gambling ventures and that it had cost him over $10,000.00; though he denied having any ill will toward Loy Campbell, he did admit saying, "I said I wasn't going to give him any more business," after Campbell represented the two men charged with burning his house. He admitted that the City of Scottsboro had condemned some property for a recreation park and that he had been to see Mayor Reid about it. He stated that some cows of his had gotten loose and had gotten on the City property and that he had gotten mad and asked the City to pay for it. He further admitted that the burning of the house and the loss of the cattle had cost him $92,000.00 and that he also had gotten mad at the Sheriff for putting him in jail.
Bynum was cross-examined pertaining to the transcript of his conversations with the undercover agent and McCrary and pointed out that there was some conversation about "old Hugh having the Sheriff killed" but that the names of the other men were not in the record. He denied giving any money *818 to McCrary for a man named Poarch to "get the Sheriff." He stated that at one time he had loaned McCrary $1,450.00 to pay for a load of whiskey and had not been repaid.
The State called John Poarch who testified that he was a ring salesman and had passed through Scottsboro on his way to Chattanooga. He stated that he had stopped by McCrary's station office and got him to sell a couple of rings for him. He stated on one occasion the appellant Bynum was present and said that he could make $5,000.00 walking money in 30 days and that McCrary would show him where the people's houses were and the ones he wanted killed. He said that McCrary had told Bynum that he was a rough fellow and could help him. He stated that he saw Bynum later and that they drove down to the back of his house, that Bynum got out of his automobile, opened the trunk and got out an envelope with $3,000.00. He said that he gave the envelope to him and that he kept $1,500.00 and gave McCrary $1,500.00. He stated that he had no intention of killing anyone but that he remembered the name of the Sheriff was mentioned and two or three men. Poarch said that he had just come forward after talking to an attorney and given the information to the State officers a few days before trial.
On cross-examination Poarch said that there was some conversation about "gassing the Sheriff" and that McCrary wanted to know about how to drill holes in the wall in order to "gas him." Poarch stated that after talking with his attorney, Mr. E. B. Thomas, in Huntsville, he gave a statement to Mr. John East, the investigator from the Attorney General's Office.
The State presented the testimony of George H. Gibson, Senior Vice President at Central Bank in Scottsboro, who showed that Bynum went to his safety deposit box on November 15, 1974, at 10:30 a. m.
Norman Farrior, an insurance agent in Scottsboro, testified that on December 4, 1972, he saw Hugh Otis Bynum in the vicinity of Tom's Cafe with Billy Ray McCrary and that this was around 10:30 or 11:00 that morning.
Two witnesses were then called to show that two subpoenas were issued by the State for Mr. Poarch, one from the District Attorney's office and one from the Clerk's Office, and that one of these had been returned marked, "Not Found." Bynum was then recalled to the stand and he denied ever seeing John Poarch or giving $3,000.00 to him and McCrary or having any conversation with them. He said that he did go to his bank on November 15, 1974, and got out some papers pertaining to the registration of some angus cattle and wrote out a check to the Angus Association for that.

I
The appellant contends the trial court erroneously admitted evidence of another offense involving Hugh Otis Bynum and as such constituted reversible error.
The State of Alabama's theory of this case is that the prior offense in question, namely the shooting of two blacks, Bates and Price, by Bynum out at his farm and his ensuing trial for this act at which the two men were represented by Loy Campbell, constituted the motive of Bynum for wanting to kill Loy Campbell.
Moreover this case involved a conspiracy between Bynum and Billy Ray McCrary and Charles X. Hale to kill not only Loy Campbell, but also Sheriff Bob Collins, District Attorney John T. "Jay" Black, and Mayor John T. Reid.
In Hardy v. State, 51 Ala.App. 489, 286 So.2d 899, we find this discussion:
"In Mason v. State, 259 Ala. 438, 66 So.2d 557, 42 A.L.R.2d 847, we find:
`The general rule in Alabama is that evidence of distinct and independent offenses is not admissible in the trial of a person accused of a crime. Brasher v. State, 249 Ala. 96, 30 So.2d 31; Harden v. State, 211 Ala. 656, 101 So. 442; Weatherspoon v. State, 36 Ala.App. 392, 56 So.2d 793; Baker v. State, 19 Ala.App. 437, 97 So. 901, cert. denied 210 Ala. 320, 97 So. 903.'

*819 "In Gassenheimer v. State, 52 Ala. 313, we find the following statement:
`. . . There are other exceptions, which, if necessary to classify, would be found perhaps to range themselves under these heads: when the offence charged and the offence proposed to be proved are so connected that they form part of one transaction; when it is material to show the intent with which the particular act charged as criminal was done, evidence of another similar act, though it was in itself a criminal offence, may be given; when it is necessary to prove a motive for the criminal act imputed, and there is an apparent relation or connection between that act and other criminal acts committed by the accused; when it is necessary to prove the identity of the offender, or of an instrument used in committing the offence. . . .'
"In Harden v. State, 211 Ala. 656, 101 So. 442, it was said:
`Motive and intent are involved in homicide cases. These are not the same in law. "Intent" is the ripened purpose to effect a result; while "motive" is the moving power which leads the mind to desire the result and form the purpose. The intent must exist in all cases. If a crime is clearly shown to have been committed by the accused, as in case of one intentionally and without cause striking a deadly blow with an axe, the question of motive would be of little importance. But where the direct evidence is in conflict as to whether the accused did the act, or is partially or wholly circumstantial upon that issue, the question of motive becomes a leading inquiry.
`In such case if there is any evidence tending to support a reasonable inference that the homicide was committed to conceal another crime, evidence of such other crime is admissible.
`Wide latitude is given in search of a real motive to connect the accused with the killing. However, inconclusive may be the evidence standing alone, if it explains other circumstances tending to show guilt, it should go to the jury as a circumstance to be weighed with that caution which should always obtain in passing upon circumstantial evidence. . . .` [Cases cited.]
"Where, as here, the evidence in question is partly direct and partly circumstantial, the question of motive is a matter of very material concern. Harden v. State, supra, and cases cited.
"As observed in Jarrell v. State, 35 Ala. App. 256, 50 So.2d 767:
`In the case of Earnest v. State, 21 Ala. App. 534, 109 So. 613, 614, this court said:
"As to showing a motive for the commission of an offense, the law says it is not necessary in order to prove the crime; but evidence of motive is always admissible. In other words, it is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense. It may spring from the lust of gain, or the gratification of an unlawful passion, from animosity, ill will, hatred, or revenge. The extent or magnitude of such motive, whether great or small, is also a proper inquiry. The rulings of the court upon this subject are free from reversible error."
Inasmuch as the evidence indicates that Bynum's motive for the bombing of Loy Campbell's automobile was to "get even" for his involvement as attorney for Bates and Price, such is the furtherance of a common plan or scheme in which Bynum's intentions were to also sacrifice the lives of Collins, Black and Reid. Since this was also one of the State's theories in entering the evidence in question, such was properly admitted under Hawes v. State, 88 Ala. 37, 7 So. 302, and cases cited therein. See also Hardy v. State, supra. Statements made by the appellant or his companions pertaining to their plans just prior to the alleged assault are clearly admissible under Parsons v. State, 32 Ala.App. 266, 25 So.2d 44, as shedding light on the motives and preparation for committing the offense in question. Burton v. State, 115 Ala. 1, 22 So. 585; Fuller v. State, 269 Ala. 312, 113 So.2d 153; Davis v. State, 213 Ala. 541, 105 So. 677;
*820 Powell v. State, 219 Ala. 557, 123 So. 34; Vincent v. State, 231 Ala. 657, 165 So. 844; Wilkins v. State, 29 Ala.App. 349, 197 So. 75, cert, denied 240 Ala. 52, 197 So. 81; Harden v. State, supra.
Under the above authorities, the evidence pertaining to the shooting incident and the barn burning incident and the ensuing trials was properly admitted as shedding light on the intent and motive of the appellant Bynum in this case.

II
The appellant next contends that he may not be convicted on the uncorroborated testimony of an accomplice, here Billy Ray McCrary, citing Title 15, § 307, Code of Alabama 1940. In construing this section, the Supreme Court, through Mr. Justice Stakely, in Burns v. State, 246 Ala. 135, 19 So.2d 450, held:
"Whether or not there was evidence corroborating the accomplice witness, tending to connect the defendant with the commission of the offense, is a question of law; its weight and sufficiency, along with the testimony of the accomplice to show the defendant's guilt beyond a reasonable doubt, were questions for the jury. Code 1923, § 5635 [Code 1940, Tit. 15, § 307]; Read v. State, 195 Ala. 671, 71 So. 96; Doss v. State, 220 Ala. 30, 123 So. 231, 68 A.L.R. 712; Lindsey v. State, 170 Ala. 80, 54 So. 516.
"It is not necessary that the corroborating evidence refer to any particular statement or fact testified to by the accomplice. If it strengthens the probative criminating force of his testimony and tends to connect the defendant with the commission of the offense, it is sufficient to warrant the submission of the issue of guilt or innocence to the jury. Malachi v. State, 89 Ala. 134, 8 So. 104; Ross v. State, 74 Ala. 532; Palmer v. State, 165 Ala. 129, 51 So. 358; McDaniels v. State, 162 Ala. 25, 50 So. 324." Smith v. State, 230 Ala. 413, 416, 161 So. 538, 542.
In Sorrell v. State, 249 Ala. 292, 31 So.2d 82, Mr. Justice Simpson stated the rule as follows:
"We think the following text soundly states the principle and is particularly applicable to the case at bar: `* * * the proper test in determining whether there was sufficient corroboration of the testimony of an accomplice, according to statutory requirements, is first to eliminate the evidence of the accomplice and then, if upon examination of all the other evidence there is sufficient inculpatory evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration.' 2 Wharton, Criminal Evidence § 752, 11th Ed."
The State of Alabama has done an admirable job in setting out the corroborating evidence in this case which strengthens the probative incriminating force of the accomplice McCrary's testimony and unquestionably connects Hugh Otis Bynum, Jr., the appellant, with facts of substantive character, specific in nature, which definitely tend to prove his guilt. A great deal of what now will be set out in this opinion comes from the State of Alabama's able brief filed in this cause.
The corroborating evidence in this case abundantly strengthens the probative incriminating force of the accomplices' testimony, and connects Hugh Otis Bynum, Jr., with the crime by facts of substantive character, unequivocal in nature, definitely proving his guilt.
1. Both Billy Ray McCrary and Linda Darlene Sullivan stated that Hale told them he placed dynamite under the hood of Campbell's car. This is corroborated by:
(a) Agent Barrett's testimony that a charge was placed over the frame by the left front wheel. (R. 54);
(b) Agent Barrett's testimony of debris from the automobile being scattered for a block radius around the neighborhood;
(c) Agent Barrett's testimony of a M-6 military blasting cap being embedded in the concrete underneath where the front of Campbell's car had been;
(d) Agent Barrett's testimony that "leg wire" from a M-6 military blasting cap was *821 recovered from the top of the motor of Campbell's automobile;
(e) Agent Barrett's testimony that he smelled nitroglycerin on the morning of the explosion; (R. 70)
(f) Dr. Hodge's testimony that Campbell's legs had been blown off and that there were powder burns on his face;
(g) Mr. Erwin's testimony that in his opinion, from examining wires and fragments removed from the car and from the presence of nitroglycerin, that dynamite caused the explosion.
2. The testimony of McCrary and Sullivan that Charles Hale told them he placed dynamite in Campbell's car is additionally corroborated by:
(a) Agent Miller's testimony that the only place he could find a M-6 military blasting cap was at the Highway Department in Scottsboro;
(b) That Mr. Erwin's comparison of the leg wires found in Campbell's car, to the unused ones found at the Highway Department, to the one test exploded, showed that all the wires had coating characteristics of M-6 blasting caps; that the wires were the same; and that the wires were the same chemically;
(c) The testimony of Mr. Britt, clerk at the District Highway Department Office, that Charles Hale worked for the Highway Department at places and projects during times when dynamite was shipped to those projects and places, said times being September and October of 1972, just a few weeks before the bombing in question.
3. Billy Ray McCrary's testimony that he met Hugh Otis Bynum at his father's home several times in November of 1972 to plan the death of the four proposed victims was corroborated by:
(a) Virgil McCrary, Billy Ray's brother, who testified that Hugh Otis Bynum came to his father's home in November of 1972 several times; that a week after Billy Ray returned home from prison, Bynum waited in the car and Billy Ray went out and spoke to him; (R. 185)
(b) Billy Ray McCrary's mother who testified that Bynum came to her home ten days to two weeks after Billy Ray returned from prison, Billy Ray going out to Bynum's car to talk; (R. 196)
(c) Officer Smith's testimony that a few days before the bombing he went to Billy Ray McCrary's father's house where Hugh Otis Bynum was waiting for Billy Ray. (R. 355)
(d) Mr. Grider's testimony that he saw Bynum and Billy Ray McCrary together in Bynum's car, several times before the bombing of Loy Campbell. (R. 309)
4. Billy Ray McCrary's testimony that Bynum wanted Loy Campbell, Jay Black, Sheriff Collins and Mayor Reid dead is corroborated by:
(a) Agent Wilson's testimony that in his meeting with Bynum and McCrary, Bynum wanted four people dead, especially the sheriff; (R. 419-421)
(b) John Poarch's testimony that Bynum wanted the sheriff killed and three or four more and Bynum paying $3,000.00 to kill the sheriff; (R. 700-703)
(c) Bynum's own testimony that he was friendly with Sheriff Collins until he had the trouble with the "niggers," but that he now hated the sheriff because he would not investigate or arrest anyone for burning his house; (R. 636) his testimony that he disliked Campbell and would not give him any business because he defended the two blacks that burned his house; (R. 637) his testimony that he did not like Mayor Reid or the way he ran the town and resented him for making speeches the night he was in jail for shooting the two black kids; (R. 639-643) and his testimony that Jay Black prosecuted him for shooting at the two black kids; (R. 644-645)
(d) The fact Loy Campbell helped strike a jury, said jury including some recommended by Campbell, which convicted him of assault and battery; (R. 330)
(e) Loy Campbell's testimony that when he told Bynum he had come out pretty good in the trial over the shooting of the black boys Bynum said, "Not so damn good." (R. 334) *822 (f) Campbell's testimony that after the arson and assault with intent to murder trials, Bynum no longer was friendly, talked to him or gave him legal business like before. (R. 330)
5. Billy Ray McCrary testified that Bynum told him he hated the four people because they had cost him $92,000.00 because when he shot the "niggers" he was put in jail. After being put in jail, McCrary stated Bynum told him the blacks then burned his house, barns and hay and did away with his cattle.
(a) Agent Wilson corroborated this testimony when he stated that during the meeting he had with McCrary and Bynum, Bynum told him that the sheriff had cost him $92,000.00 because when he put him in jail the blacks burned his home, barn, and he had to sell his cattle at a commercial price.
(b) Bynum testified that he hated the sheriff because when the sheriff put him in jail, it cost him $92,000.00. (R. 645)
6. Billy Ray McCrary stated he met with Charles Hale often before the bombing.
(a) Lilah McCrary, Bill Ray's ex-wife, testified that Billy Ray and Charles Hale were together many times between the time Billy Ray got home from prison and the bombing. (R. 570)
7. Billy Ray testified that Charles Hale met him at his ex-wife's house on the Sunday night before the bombing, that being December 3, 1972.
(a) Lilah McCrary testified that Charles Hale and Billy Ray were together at her house on the Sunday night before the bombing, that being December 3, 1972. (R. 569)
8. Billy Ray McCrary testified that he told Charles Hale that Sunday night not to fool around and blow himself up.
(a) This is corroborated by the testimony of Agent Barrett and Mr. Erwin that there was an explosion of Mr. Campbell's car caused by dynamite.
9. Billy Ray McCrary testified that he saw Hugh Otis Bynum the Monday morning of the bombing and talked to Bynum about the bombing.
(a) Norman Farrior testified that he saw McCrary and Bynum in town by Tom's Cafe on December 4, 1972, the morning of the bombing, standing by themselves. (R. 735-736)
10. McCrary testified that Hugh Otis Bynum paid him $2,000.00 in $100.00 bills after the bombing, perhaps a week or two after the bombing. He stated he kept $1,600.00 of the money.
(a) Virgil McCrary testified that his and Billy Ray's father died on December 15, 1972, after the bombing. He stated that when he died, Billy Ray gave him $200.00 in $100.00 bills. (R. 185)
(b) William White testified that on January 27, 1973, Billy Ray McCrary paid him $1,000.00 in $100.00 bills for a mortgage. (R. 348)
(c) Paul Chaney testified that in January of 1973 he sold Billy Ray McCrary an automobile for $350.00. He stated Billy Ray paid him with three $100.00 bills and a $50.00 bill. (R. 350-351)
(d) The testimony of John Poarch that Bynum paid him $3,000.00 in $100.00 bills to kill Sheriff Collins. (R. 703)
The payment of money in the denomination of $100.00 bills by Billy Ray McCrary shortly after he was paid $2,000.00 in $100.00 bills by Bynum, clearly and unequivocally connects Bynum with the crime charged herein.
11. McCrary and Linda Sullivan each testified that Charles Hale had tried to bomb Sheriff Collins' car before bombing Loy Campbell's; but a barking dog scared him off.
(a) Sheriff Collins testified that he had a dog for many years and had him December 3, 1972. (R. 369)
12. McCrary testified that Charles Hale told him when he put the dynamite under Loy Campbell's hood, he took out the breather. However, after closing the hood he forgot to put the breather back in the car so he hid it in some bushes close to the school.
*823 (a) Mr. Evett, a part-time custodian for the school, testified that he found a breather cap in the bushes by the band room near the school a few days later. (R. 120-121)
(b) Mr. Erwin testified that he examined this evidence and concluded that it was never in the explosion. (R. 327)
13. Lilah McCrary testified that Billy Ray McCrary told her on the night before the bombing not to let the children go to school because there was going to be a big boom and a lot of excitement in town on the next day. She further testified that he asked his son what time his recess was and when told "ten" he said it was all right for him to go to school.
(a) This is corroborated by unrefuted and undisputed evidence that an explosion did occur the next day in Loy Campbell's Pontiac automobile which was parked at his home, right across the street from the elementary school.
14. There is ample testimony from Billy Ray McCrary that he and Bynum met continually, up to four and five times a week, for two years after the Loy Campbell automobile bombing. McCrary's testimony is that the main theme of these meetings was Bynum's desire to have Sheriff Collins, Jay Black and Mayor Reid dead. He did not care how, he just wanted them dead. Bynum always inquired of McCrary if he had found somebody to kill Collins, Reid and Black and finish the job on Campbell. This is clearly corroborated by:
(a) The testimony of John Poarch who stated he met with McCrary and Bynum a few months prior to the trial. Although Bynum and Billy Ray McCrary discussed four people they wanted dead, he was paid $3,000.00 in $100.00 bills by Bynum to kill Sheriff Collins. (R. 700-703)
(b) Agent Wilson's testimony of meeting with Bynum and McCrary on December 6, 1974. He stated they talked about killing four people, especially the sheriff. He stated that Billy Ray McCrary told Hugh Otis Bynum if he could come up with $200.00 he would give Wilson $300.00 to kill the sheriff. The fact Bynum gave McCrary $200.00 is corroborated by Sheriff Collins' finding this money on McCrary immediately after the meeting with Bynum. (R. 418-422) (R. 368)
(c) The testimony of Sheriff Collins who stated he saw Hugh Otis Bynum and Billy Ray McCrary together a lot of times at Tom's Cafe and at Billy Ray's service station at Martintown Hill after the bombing, to wit: between December of 1972 and December of 1974. (R. 151)
(d) The testimony of Billy Ray's mother that she saw Billy Ray and Hugh Otis Bynum talking in front of Tom's Cafe several times after the bombing. (R. 194-198)
(e) Officer Smith's testimony that he saw Hugh Otis Bynum and Billy Ray McCrary talking at Billy Ray's trailer in the summer of 1974. (R. 356-357) Also, Officer Smith's testimony that he saw Hugh Otis Bynum and Billy Ray McCrary at another trailer Billy Ray owned. He stated that Bynum drove up while he was there. Bynum and McCrary talked, Bynum still being there when Smith left. (R. 356-357)
Officer Smith stated additionally that between the bombing and Bynum's arrest he saw Bynum and McCrary many times in front of Tom's Cafe talking, always talking by themselves. (R. 357)
(f) Tom Sisk's testimony that he saw Billy Ray McCrary and Bynum together many times in his restaurant and at the town square talking. (R. 509)
(g) Lilah McCrary's testimony that she saw Hugh Otis Bynum and Billy Ray together many times after the bombing. (R. 585)
15. Billy Ray testified that Hugh Otis Bynum's reason for wanting to kill Mayor Reid was because the Mayor was running the town; yet Hugh Otis Bynum's people were responsible for the town, and he was not going to let the Mayor run it the way he wanted.
(a) This is corroborated by Bynum himself who told Attorney General Baxley on cross-examination that he did not like Reid; that he resented him making speeches the night Bynum was put in jail; and that he *824 did not like the way he was running the town. (R. 643-644)
16. Billy Ray McCrary testified about an incident involving a ring salesman from Huntsville (John Poarch) and a meeting held with Bynum, the ring salesman and himself. He also testified to the talk to kill four people and the specific plan to kill Sheriff Collins. He also testified that Bynum paid the ring salesman $3,000.00 to kill the sheriff and that he and the ring salesman split it up. This occurred a few months prior to the instant trial.
(a) The ring salesman, John Poarch, corroborated McCrary's version of the incident between himself, McCrary and Bynum.
(b) Bynum also admits meeting a man at Billy Ray McCrary's service station around the same time as the Poarch incident. (R. 645)
(c) McCrary testified that Bynum went to the bank the morning he paid Poarch. George Gibson, senior vice president at the Central Bank in Scottsboro, testified that the bank records show that Bynum made a withdrawal from his safety deposit box that same morning. (R. 727)
17. Billy Ray McCrary also testified that he went to Montgomery and talked to Attorney General Baxley; that on December 6, 1974, he went back to Scottsboro to the Holiday Inn and was searched, but had no money; that he and undercover agent Wilson met Bynum at Tom's Cafe; that they drove to the Holiday Inn and talked; that they returned to Tom's Cafe where Bynum put two $100.00 bills in McCrary's shirt pocket and then Wilson and McCrary returned to the Holiday Inn.
(a) McCrary's version of the events that occurred on December 6, 1974, are precisely corroborated by Agent Wilson.
(b) The testimony of Officer Ferguson that McCrary was searched at the Holiday Inn and had no money. (R. 366)
(c) Sheriff Collins' testimony that he found two $100.00 bills in McCrary's shirt pocket immediately after the meeting with Wilson and Bynum.
18. Sheriff Collins testified that when Bynum was arrested, he searched him and found money on him which was folded in the middle longways and in the middle again. (R. 369) Tom Sisk also testified that Bynum folded his money the same way. (R. 509). This testimony corroborates the following:
(a) McCrary's testimony that the bills Bynum put in his shirt were folded in the same way as the money found on Bynum.
(b) Linda Sullivan testified that Charles Hale gave her some money but did not tell her who it was from. The money given to her was folded the same way as the money found on Bynum when arrested. (R. 374)
(c) Linda Sullivan's testimony that Charles Hale went into Tom's Cafe flat broke and came out with some money. She stated that she did not know who gave Charles the money, but it was folded the same way as the money found on Bynum the night of his arrest. (R. 378)
19. Billy Ray McCrary testified that Charles Hale told him on the Sunday night before the bombing that he had ten sticks of dynamite, five for Campbell and five for Collins. Linda Sullivan stated that one night she, Charles Hale and two others went behind the Carriage House Apartments looking for some dynamite Charles Hale had hidden in early 1973. This took place in March 1974.
Linda stated she gave Agent Barrett a map to where they looked for the dynamite behind Carriage House Apartments.
(a) All this testimony is corroborated by Agent Barrett. He stated he found five sticks of dynamite in a hedgerow behind the Carriage House Apartments. (R. 58-60) He stated that he found behind the apartments M-6 military blasting caps, the same type caps and dynamite used to blow up Loy Campbell's car. (R. 61)
20. Both McCrary and Linda Sullivan testified about Bynum giving Charles Hale a .30-06 rifle for the purpose of going to Sheriff Collins' farm and killing him.
(a) Bynum admitted owning two .30-06 rifles, buying one ten years ago and one two years before the trial. (R. 630) *825 (b) Agent Barrett's testimony that he found a .30-06 rifle at Bynum's home when he searched. (R. 501) Billy Ray McCrary stated that Bynum gave Charles Hale the rifle, but gave him the scope for the rifle separately. This is corroborated by:
(c) Linda Sullivan who was not an accomplice to the instant crime, observing Charles Hale coming home with a .30-06 rifle and scope. (R. 372) She stated she helped him put the scope on the rifle.
21. Billy Ray McCrary testified that Bynum told Hale to go to Collins' farm to kill him with the rifle.
(a) After getting the rifle, Linda Sullivan testified she and Charles went up to some farm near Tupelo Pike. (R. 374)
22. Linda Sullivan testified that Charles Hale told her he got the blasting caps at the Highway Department where he was working.
(a) This is corroborated by Agent Miller's testimony that the only place to get dynamite was the Highway Department (R. 126) and Mr. Britt's testimony that the Highway Department records showed that Charles Hale worked on projects, a short time before the bombing, where dynamite was sent. (R. 142-146)
23. Billy Ray McCrary and Linda Sullivan testified that Charles Hale was active in the conspiracy. Each testified that Hale was the one who actually put the dynamite in Loy Campbell's car for Bynum. This is corroborated by:
(a) The testimony of Isaac Roberts, the uncle of Charles Hale. He stated that around the time Hale was arrested in Florida, Hugh Otis Bynum came to see him several times. He stated that Bynum would ask him if he had heard from Charles Hale and if he did, to have Charles call him.
Mr. Roberts stated that on a Sunday, when the newspaper had an article about Charles Hale being arrested in Florida, Bynum came to his home and told him if Charles called to tell him to keep going and not come back, "tell him to go to Mexico if he has to." (R. 407-410)
24. Billy Ray McCrary testified that Bynum came up to his service station at Martintown Hill the night he was arrested, shortly after the meeting between Wilson, McCrary and Bynum.
(a) Sheriff Collins testified that he saw McCrary and Bynum together at Martintown Hill between 8:00 and 9:00 P.M. on December 6, 1974.
25. Finally, two other examples of corroboration to establish the truthfulness of Billy Ray McCrary that Bynum wanted Loy Campbell dead and that Bynum paid him money to find people to kill Black, Campbell, Reid and Collins.
(a) The testimony of Loy Campbell that when he asked Bynum if he had hired Billy Ray to blow him up, Bynum just smiled and walked away. (R. 335)
(b) That when Bynum saw Campbell for the first time after he got out of the hospital Bynum lit up like a child who had just seen a new toy. (R. 335)
(c) Bynum admitted "loaning" McCrary $550.00 on a check McCrary had written to Tom Sisk, said check being written on insufficient funds. (R. 628)
As observed by this Court through Harris, J., in Wyatt v. State, 51 Ala.App. 226, 283 So.2d 675:
"Under the statute requiring corroboration of the testimony of accomplices to authorize conviction of a felony (Title 15, § 307, Code of Alabama 1940), the corroborative evidence need not be strong, nor sufficient of itself to support the conviction, the criterion being that it legitimately tends to connect the accused with the offense. 23 C.J.S. Criminal Law § 812(5), p. 125 (1961); Moore v. State, 30 Ala.App. 304, 5 So.2d 644.
"Nor need such corroborative evidence directly confirm any particular fact stated by the accomplice. Skumro v. State, 234 Ala. 4, 170 So. 776."
Beyond question, the State of Alabama here amply demonstrated the corroborating evidence in this cause.

*826 III
Appellant next contends that Charles X. Hale's statements to Linda Darlene Sullivan were inadmissible as hearsay. This premise is faulty, however, in that it overlooks two essential elements which were here proven by the State of Alabama. First, the State has established the existence of conspiracy, in fact a continuing one, and additionally has here laid a proper predicate for the admission of Linda Darlene Sullivan's testimony.
In Muller v. State, 44 Ala.App. 637, 218 So.2d 698, cert. denied 283 Ala. 717, 218 So.2d 704, this Court stated:
"A witness may not testify to acts or statements made by third parties which occur outside the presence or hearing of the defendant. The declarations or conduct of a third party, not made or done in the presence of the defendant, are not admissible into evidence against the defendant unless a conspiracy was shown to have existed between defendant and said third party. Before such evidence can be admitted, it is necessary that a foundation be laid by proof addressed to the court, prima facie sufficient to establish the existence of such a conspiracy. Smith v. State, 133 Ala. 73, 31 So. 942; Tittle v. State, 15 Ala.App. 306, 73 So. 142.
"A conspiracy is rarely proven by positive or direct testimony but usually by circumstances. Durden v. State, 18 Ala. App. 498, 93 So. 342; Hunter v. State, 112 Ala. 77, 21 So. 65; Gandy v. State, 29 Ala.App. 485, 198 So. 265.
"The record reveals that evidence was presented from which the jury might reasonably infer the existence of a conspiracy. Therefore, the declarations and conduct of the conspirator in furtherance of the common purpose were admissible against the co-conspirator. Thomas v. State, 133 Ala. 139, 32 So. 250."
Clearly Mrs. Sullivan's testimony was properly admitted at trial. Goodman v. State, 52 Ala.App. 265, 291 So.2d 358; Bland v. State, 42 Ala.App. 392, 166 So.2d 728; Connelly v. State, 30 Ala.App. 91, 1 So.2d 606.

IV
The appellant next asserts that he was prevented a full and searching cross-examination of Agent Barrett and cites us to R. 501 wherein the following exchange occurred:
"Q. All right, sir; Mr. Barrett, the first time you talked to Billy Ray McCrary, when was it, concerning this investigation?
"A. A few days after the bombing of December 4th.
"Q. What did he tell you on that occasion?
"A. Mr. McCrary denied any knowledge of the bombing.
"Q. All right, sir, and the next time you talked to him, when was that?
"A. I don't know the exact date, Mr. Bowen; I saw him again, probably a month or so later after the original interview.
"Q. What did he tell you on that occasion?
"A. He still denied any knowledge of the bombing.
"Q. Now, what did he tell you on the occasion that you interviewed him last month?
"MR. B. DON HALE: We object, Your Honor.
"THE COURT: Sustained, that's the part he is objecting to."
At the outset, it should be observed that at this point during the trial, Agent Barrett is on direct examination by the appellant and was not on cross-examination when the above exchange occurred.
Further it should be here noted that Agent Barrett has twice during the exchange above quoted indicated that Billy Ray McCrary had made prior inconsistent statements during questioning so that the balance of the questioning on this point is repetitious and cumulative. See: Wright v. State, 49 Ala.App. 539, 274 So.2d 95; Browder v. State, 54 Ala.App. 369, 308 So.2d 729, cert. denied 293 Ala. 746, 308 So.2d 735;
*827 Diggs v. State, 54 Ala.App. 414, 309 So.2d 123.
Moreover in our careful examination of this record during the cross-examination of Billy Ray McCrary, nowhere did the appellant lay any predicate whatsoever for an attempted impeachment of McCrary pertaining to an inconsistent statement as to the time and place or to whom such statement may have been made. Clearly, therefore, the trial court properly sustained the objection in question. Edwards v. State, 279 Ala. 371, 185 So.2d 393.
Also there was no showing by the appellant's attorneys as to the nature of the answer sought to be elicited at this point in the questioning. Tolbert v. State, 87 Ala. 27, 6 So. 284; Ross v. State, 139 Ala. 144, 36 So. 718; King v. State, 16 Ala.App. 103, 75 So. 692. Clearly no error is shown.

V
Appellant next asserts that in two instances the trial court failed to properly charge the jury as to the law in this case. In the first instance, the appellant asserts that the trial court failed to charge the jury as to the asserted prior inconsistent statements by the witness McCrary. We have carefully examined the able trial judge's charge in this cause and find that such did properly set forth the applicable legal principles. Title 7, § 273, Code of Alabama 1940; Shaw v. State, 19 Ala.App. 581, 99 So. 319.
Appellant next asserts that the trial court's charge was not adequate on the presumption of innocence. We do not agree as we believe that Judge Sullivan's oral charge fully covered this subject, and the charges requested by the appellant were refused without error. Title 7, § 273, Code of Alabama 1940; Murray v. State, 49 Ala.App. 590, 274 So.2d 365; Henderson v. State, 49 Ala.App. 275, 270 So.2d 822; Kemp v. State, 278 Ala. 637, 179 So.2d 762; Gordon v. State, 268 Ala. 517, 110 So.2d 334.

VI
Appellant asserted in his motion for new trial that a separation of the jury occurred at trial thus entitling the appellant to a new trial.
The trial judge held a full hearing on this motion at which nine of the twelve jurors appeared and testified. Each of these in essence stated that they had not been subjected to any outside influence whatever during trial nor had they conversed with any persons pertaining to the trial nor read any newspaper or other publications or heard any television or radio broadcasts while serving as jurors.
As to the remaining three jurors, two of these were ill and one away on vacation at the time of the hearing on this motion. Each of these three jurors subsequently filed affidavits setting forth that they, too, had not been subjected to any outside influence whatsoever, nor had they heard the case discussed, nor read any periodicals, nor heard any radio or television broadcasts. No counter affidavits were filed by appellant. In brief, one juror related that he had received a telephone call from his office pertaining to some business equipment and a second juror had received a call pertaining to some extra clothing and had inquired as to the status of his mother-in-law's condition, she being ill.
We are of the opinion that the State of Alabama here fully met its burden of showing that no improper influences were brought to bear upon the jury or any members thereof, and the motion for new trial was, therefore, properly overruled. King v. State, 266 Ala. 232, 95 So.2d 816; Palmore v. State, 283 Ala. 501, 218 So.2d 830; Hogue v. State, 54 Ala.App. 682, 312 So.2d 86.
In closing we wish to note the able briefs filed by the attorneys representing the appellant and the State of Alabama in this cause. This case was ably argued before this Court by these attorneys.
Beyond question, this case was hard fought, but the record shows a fair and impartial trial in the best traditions of the Alabama Bar. We have carefully examined this record and find no error therein. This case is due to be and the same is hereby
AFFIRMED.
*828 HARRIS, DeCARLO and BOOKOUT, JJ., concur.
CATES, P. J., not sitting.

ON REHEARING
TYSON, Judge.
Counsel for the appellant calls attention to the fact that, while the Honorable Loy Campbell did represent Bates and Price at the trial wherein they were charged with the burning of the appellant's, Hugh Otis Bynum's, barn, Campbell did not represent the two blacks that Bynum was charged with shooting. The names of these two men were Green and McCamey.
The Honorable Roderick Beddow, Jr., and members of his firm, represented Bynum at the trial wherein he was charged with the shooting of Green and McCamey. Mr. Beddow did confer with the Honorable Loy Campbell concerning the selection of prospective jurors from the venire in this case. This is all that is shown in the evidence with reference to this trial, except to show the result thereof and Bynum's feeling toward Loy Campbell. We believe this testimony to have been properly admitted as bearing upon the motive of Bynum in line with Brothers v. State, 236 Ala. 448, 183 So. 433, and the authorities cited in our opinion on original deliverance.
OPINION EXTENDED, APPLICATION OVERRULED.
HARRIS, DeCARLO and BOOKOUT, JJ., and SIMMONS, Supernumerary Circuit Judge, concur.
CATES, P. J., not sitting.